**SOUTHERN NATIONAL BANK OF NORTH CAROLINA, Plaintiff–Appellant,**

v.

**UNITED PACIFIC INSURANCE COMPANY, Defendant–Appellee,**

v.

Kenneth SASSER; Bailey Gray; Nan Ward; Hector Maclean; L. Glenn Orr; Joseph Sandlin, Third Party Defendants.

**SOUTHERN NATIONAL BANK OF NORTH CAROLINA, Plaintiff,**

v.

**UNITED PACIFIC INSURANCE COMPANY, Defendant–Appellant,**

v.

Kenneth SASSER; Bailey Gray; Nan Ward; Hector Maclean; L. Glenn Orr; Joseph Sandlin, Third Party Defendants–Appellees.

Nos. 88–3975, 88–3989.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 1, 1988.

Decided Jan. 3, 1989.

Dickson McLean, Jr., Horace Edney Stacy, Jr. (McLean, Stacy, Henry & McLean, Lumberton, N.C., on brief), for plaintiff-appellant.

E.K. Powe, David E. Fox (Moore & Van Allen, Durham, N.C., on brief); Charles E. Nichols (Everett B. Saslow, Jr., Nichols, Caffrey, Hill, Evans & Murrelle, Greensboro, N.C., Ervin I. Baer, Butler, High & Baer, Fayetteville, N.C. on brief); Isley Murchison Biggs (John W. Campbell, C. Christopher Smith, Lumberton, N.C., on brief), for defendant-appellee.

Before WINTER, Chief Judge, and MURNAGHAN and SPROUSE, Circuit Judges.

MURNAGHAN, Circuit Judge:

Here we have an insured who attempts to convince us that an insurance policy means one thing even though its language plainly says another. We find the insured's contentions unpersuasive and reject its interpretation of the policy.

Southern National Bank of North Carolina ("SNB") has attempted to recover under an insurance policy for losses suffered as a result of securities fraud. The insurer, United Pacific Insurance Company ("United Pacific"), argues that the policy it issued to SNB does not cover the loss in question. In addition, United Pacific has brought a third-party action against a number of SNB's directors, officers and employees, alleging that their negligence contributed to the bank's loss and they should be held liable in the event United Pacific must pay under the insurance policy.

The district court dismissed the third-party claims on grounds that North Carolina law did not allow United Pacific to be subrogated to the bank's cause of action for negligence against its directors, officers and employees. We need not explore the correctness of that theory if the district court was correct in granting summary judgment in favor of United Pacific on the grounds that the facts alleged did not bring SNB's loss within the coverage of the insurance policy. SNB and United Pacific both appealed.

We agree that the insurance policy does not cover the loss suffered by SNB, and we affirm the grant of summary judgment in United Pacific's favor. Our decision moots United Pacific's third-party claims.

I.

In 1984, United Pacific issued to SNB an insurance policy known in the banking and insurance industries as a "Bankers Blanket Bond." In pertinent part, the bond indemnified SNB for loss of property resulting directly from:

theft, false pretenses, common law or statutory larceny committed by a person

(i) present in an office of, or on the premises of, the Insured, or

(ii) present on the premises in which the Property is lodged or deposited.

Kenneth Sasser, a vice president of SNB and a member of the bank's investment department, made five successful securities purchases for SNB through Gregory Herbert, president of Parr Securities Corporation ("Parr"), during the early months of 1984. In making the purchases, Sasser followed SNB's normal practice of using third-party safekeeping agents, which would hold the bank's money until receipt of the securities from the seller.

By May 1984, Parr had accummulated large losses in the securities market. To cover such losses Parr, through Herbert, issued fraudulent securities repurchase agreements, mainly to New York state school districts and municipalities. When some of the school districts decided to close out their repurchase agreements and demanded payment for their securities, Parr needed more than $5 million in cash to meet those obligations.

Herbert decided to raise some of the money by swindling SNB. On May 31, 1984, Herbert placed a telephone call to Sasser from Parr's offices in New York City. Herbert urged Sasser, who was at SNB's office in Lumberton, North Carolina, to purchase $2.8 million worth of U.S. Treasury Bonds, and asked him to wire the money directly to Parr's account at the Maiden Lane Branch of Chemical Bank in New York. Such a direct transfer of money was a departure from the usual third-party safekeeping arrangement. Herbert convinced Sasser to bypass the usual safeguard by telling him that he had the bonds in odd lots and needed time to compile them before making delivery. In fact, Herbert had no such bonds.

The next day, Sasser wired the $2.8 million from Lumberton to Chemical Bank in New York City. It is undisputed that at the time the money reached the Parr account, Herbert was at his office at Parr. Later that day, Herbert telephoned Chemical Bank from his office at Parr and ordered the $2.8 million transferred to one of the school districts that was due payment from Parr.

At some later point, Herbert persuaded Sasser to exchange the government securities, which in truth were non-existent, for other fictitious Treasury notes, which Herbert asserted were worth $2.765 million. Herbert sent SNB $35,000 in cash for the purported difference in value between the non-existent securities.

SNB never received any of the securities it supposedly had bought from Parr and never got back its $2.8 million, with the exception of the $35,000. SNB sought to recover its loss under the insurance agreement with United Pacific.

II.

The blanket bond would cover SNB's loss only if Herbert used false pretenses to deceive SNB while he was at SNB's offices or while he was on the same premises where SNB's money was deposited or otherwise located. Herbert, however, was at neither place when he made the misrepresentation that prompted SNB officials to send the $2.8 million. That fact is fatal to SNB's claim.

SNB attempts, through verbal manipulations and leaps of logic, to demonstrate that Herbert was on the premises with the bank's money when he used false pretenses to trick SNB. SNB's argument essentially consists of four assertions: (1) when deposited in Parr's account in Chemical Bank, the $2.8 million was held in a trust for the benefit of SNB; (2) any money deposited in Parr's bank account was constructively on Parr's premises; (3) Herbert's obtaining money by false pretenses did not occur until the money reached Parr's account; and (4) Herbert was on the premises of Parr when the money reached the Parr account. Therefore, according to SNB, Herbert engaged in false pretenses while he was on the same premises where the money was deposited, and the loss must fall within the coverage of the blanket bond.

SNB's argument must fail for a very simple reason: Herbert was never *physically* in the same location in which the bank's money was deposited when he made the misrepresentations that prompted SNB to wire the $2.8 million to New York.

█ At the outset, we reject SNB's attempt to invoke the North Carolina doctrine requiring courts to interpret any ambiguous terms against the insurance company and in favor of the policyholder. *See Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.*, 276 N.C. 348, 354, 172 S.E.2d 518, 522 (1970). The appellant argues that the blanket bond's "on premises" language is ambiguous and must be construed in SNB's favor. However, the doc-

trine favoring the policyholder's interpretation applies only if "the language of the policy is fairly and reasonably susceptible to either of the constructions for which the parties contend." *Id..* As we explain below, the blanket bond is not "reasonably susceptible" to the interpretation suggested by SNB.

Turning to the major thrust of SNB's argument, we decline to address the assertion that Parr held the $2.8 million in trust for SNB. Even if an express or constructive trust existed, SNB must show that the funds were deposited on the same premises where Herbert was located when he made the misrepresentations to Sasser. SNB fails to meet its burden because at the time Herbert telephoned from his New York office and used false pretenses to persuade SNB to buy non-existent securities, the $2.8 million was still deposited or otherwise located in Lumberton, North Carolina.

■ SNB incorrectly asserts that Herbert did not use false pretenses until the money was credited to the Parr account in New York. SNB reaches that conclusion by asserting that the crime of obtaining property by false pretenses was not complete until the perpetrator, here, Herbert, received the property. Even assuming, for the sake of argument, that Herbert could not be subject to criminal liability until he received the money,[1] it does not follow that he did not use false pretenses at an earlier point to induce SNB to send the $2.8 million. The crucial factor in determining whether the "on premises" requirement has been satisfied is not the defrauder's location when criminal liability attaches, but rather his location when he engages in misrepresentations.

■ It is undisputed that Herbert made his misrepresentations deceiving SNB before the $2.8 million left North Carolina. That misrepresentation constituted "false pretenses" for purposes of the blanket bond. The "on premises" language has meaning only if it requires the person who perpetrates the fraud to be on the same premises where the bank's money is deposited or otherwise located at the moment when he or she makes the misrepresentation.

To adopt SNB's interpretation of "false pretenses" would require the court to read the "on premises" requirement out of the blanket bond. Under SNB's theory, a person who used a telephone or computer link from anywhere in the world to make a misrepresentation to a bank and who later received money in hand as a result of the deceit would be deemed to have been on the same premises as the money when he or she used false pretenses. Such a theory would directly contravene the purpose of the "on premises" language. Commentators, including those in the banking industry, have emphasized that the "on premises" requirement in standard blanket bonds is designed to exclude coverage for losses from fraud perpetrated by telephone or computer, except in those rare instances where the perpetrator phones or uses a computer hook-up from the property of the bank itself or from the property of a custodian entrusted by the bank to safeguard the funds. *See* American Bankers Association, *Digest of Bank Insurance* 1.3.12 (4th ed. 1981 & Supp.1984) (no coverage for loss involving false pretenses by telephone call from outside of premises); Ardis & Johnson, *Fidelity and Computer–Related Risk Insurance,* Magazine of Bank Administration, March 1985, at 56 (no coverage for theft resulting from use of telephone and computer to tap bank computer from outside bank premises); Huss, *Crime Insurance for the Electronic Age,* Magazine of Bank Administration, May 1983, at 58 (no coverage for loss arising from fraudulent electronic access from outside the premises). SNB's theory would require coverage for the very types of long-distance fraud that the drafters sought to, and did, exclude.

■ The blanket bond would not cover SNB's loss even if we accepted SNB's position that Herbert used false pretenses only

---

1. We express no view on SNB's assertion that no criminal liability would attach until the person actually obtained the property.

when the $2.8 million reached the Parr account at Chemical Bank. Even under that theory, SNB could prevail only by showing that Herbert was on Chemical Bank's premises when the money was deposited in the account. It is undisputed that Herbert was not at Chemical Bank, but instead was in his office elsewhere in New York City. SNB tries to circumvent the location problem by arguing that the account, although in Chemical Bank, was legally located at Parr's corporate offices, where Herbert was at the moment the $2.8 million was credited to the account. The cases the appellant cites for this proposition are inapposite because they involve questions about the situs of bank accounts and other similar property for purposes of taxation, establishing jurisdiction or distributing an estate upon death. *See Wilkins v. Ellett,* 76 U.S. (9 Wall.) 740, 19 L.Ed. 586 (1870) (distribution of estate); *McGehee v. McGehee,* 189 N.C. 558, 127 S.E. 684 (1925) (same); *Baldwin v. Missouri,* 281 U.S. 586, 50 S.Ct. 436, 74 L.Ed. 1056 (1930) (taxation); *Virginia v. Imperial Coal Sales Co.,* 293 U.S. 15, 55 S.Ct. 12, 79 L.Ed. 171 (1934) (same); *Blodgett v. Silberman,* 277 U.S. 1, 48 S.Ct. 410, 72 L.Ed. 749 (1928) (same); *Kirtland v. Hotchkiss,* 100 U.S. 491, 25 L.Ed. 558 (1879) (same); *Central Trust Co. v. Chattanooga, Rome & Columbia R. Co.,* 68 F. 685 (C.C.E.D.Tenn.1895) (jurisdiction).

The legal fiction that property is located at the owner's domicile might be appropriate for taxation and similar purposes, but it is inappropriate to apply it in interpreting the blanket bond's "on premises" proviso. The "on premises" language is designed to limit coverage to losses sustained because of the fraudulent act of a person *physically* present at the bank or where the bank's money is deposited. It plainly so states. The actual physical location of the defrauder in relation to the place of deposit is the important fact. Legal fictions developed for other purposes simply have no relevance.

### III.

In conclusion, the fact that Herbert was neither at SNB's offices nor on the premises where SNB's money was deposited at the time he made the misrepresentations precludes coverage of the loss under the blanket bond. The district court properly granted summary judgment in favor of United Pacific.[2]

AFFIRMED.

---

**2.** In light of our decision, we need not address United Pacific's argument that SNB's loss was excluded from coverage under the blanket bond's trading loss provision.