**PINE BLUFF NATIONAL BANK, Plaintiff**

v.

**ST. PAUL MERCURY INSURANCE CO., Defendant.**

**No. 5:03CV00400 JLH.**

United States District Court, E.D. Arkansas, Pine Bluff Division.

Oct. 20, 2004.

Joseph A. Strode, Bridges, Young, Matthews & Drake, Pine Bluff, AR, for Plaintiff.

John G. Lile, III, Wright, Lindsey & Jennings, Little Rock, AR, Michael Keeley, Katherine J. Gibson, Duncan L. Clore, Strasburger & Price, L.L.P., Dallas, TX, for Defendant.

## *OPINION AND ORDER*

HOLMES, District Judge.

The issue in this case is whether Pine Bluff National Bank (the "Bank") has cov-

erage under a financial institution bond (the "Bond") issued by St. Paul Mercury Insurance Company ("St.Paul") for losses that the Bank suffered as a result of a fraud perpetrated by one of its borrowers. St. Paul has moved for summary judgment.

## I. THE UNDISPUTED FACTS

In July 1998, the Bank established a revolving line of credit for Ralph Croy & Associates, Inc. ("Croy"). Croy was a vendor of copy machines. Many of his customers were state agencies. To secure the line of credit, the Bank obtained from Croy a general assignment of Croy's assets. The assignment of assets included an assignment of the stream of payments due to Croy under lease agreements with its customers. Periodically, Croy would deliver to the Bank packages of signed lease contracts. In exchange for the leases, the Bank would advance funds against the line of credit. The Bank determined the amount of credit it would extend based on the value of the lease contracts that Croy delivered. The value of a lease was computed by multiplying the lease term by the monthly lease payment.

Croy continued to make payments to the Bank until late 2001 or early 2002, when the payments ceased and the loan went into default. After the loan went into default, the Bank discovered in Croy's records purchase orders that generally corresponded to the leases that Croy had delivered to the Bank, except for the length of the lease terms. The lease terms on the leases delivered to the Bank were greater than the lease terms indicated on the corresponding purchase orders. For example, many of the state agency leases delivered to the Bank showed that the agencies had leased copy machines for 60 months, whereas the corresponding purchase orders showed that the state

agencies had leased the copy machines for only 12 or 36 months. Further investigation showed that some of the signatures of lessees in the leases delivered to the Bank were forged. A few leases were wholly fictitious.

The scheme was carried out as follows. The lease transaction between Croy and the state agency would be initiated by a state purchase order. Croy would subsequently deliver a copy machine and get a delivery form signed by a local agent of the particular state agency. In most or all cases, the person who initiated the purchase order for the state agency was an authorized purchasing official, who had authority to bind the state agency, and who was typically located somewhere other than the delivery location. For example, James Lipsey is an authorized purchasing agent for the University of Arkansas Cooperative Extension Service. His office is in Little Rock. Mr. Lipsey executed purchase orders whereby the Cooperative Extension Service leased copy machines from Croy for Cooperative Extension Service offices in various counties throughout the State of Arkansas. Croy would deliver those copy machines to the offices in the various counties and have delivery forms signed by the person in the various counties who received those copy machines. At the direction of Ralph Croy, the company owner and president, an employee named Wendell Brown or some other employee would prepare lease forms showing that the copy machine had been leased for 60 months, when in fact it had been leased for only 12 months or 36 months. In some instances, Brown or another Croy employee would ask the person who received the copy machine to sign the lease form and represent that the lease form was merely a delivery receipt. In other incidences, Brown or another Croy employee would forge the signature, using the name of the person who received delivery of the copy

machine as the person who was signing on behalf of the agency.

Croy would then deliver these falsified lease forms, with 60–month lease terms, to the Bank. The Bank would calculate the value of the lease contracts based on 60–month lease terms, not on 12–or 36–month lease terms as reflected in the actual purchase orders. The effect was that the Bank loaned Croy substantially more money than Croy was entitled to receive based upon his actual contracts. As described by the Bank, Croy's scheme was much like a Ponzi scheme, with Croy continually borrowing more money than the lease income could repay and having to falsify more and more leases to service the loan. Croy would keep the old debt serviced by pyramiding new debt. The scheme worked until Ralph Croy became ill in late 2001 and missed work for about three months. During that time, the line of credit went in default, and the fraudulent scheme was discovered.

The Bank alleges that it suffered a loss exceeding $1.1 million as a result of the fraudulent scheme. The Bank gave timely notice of its claims and its losses to St. Paul. St. Paul denied coverage, and the Bank initiated this action.

The Bank's claim is based upon 83 leases that it possesses as collateral for the line of credit.[1] Apparently, all 83 had lease terms that exceeded the actual terms to which Croy's customers agreed. The attorney representing the Bank stated at oral argument that Brown or another Croy employee forged the signatures on 39 of the 83 leases containing inflated terms. The Bank contends that the Bond covers its losses on all of the 83 leases and perhaps on others. St. Paul contends that the

Bond does not cover the Bank's losses on any of the 83 falsified leases.

## II. THE PROVISIONS OF THE BOND

The Bank contends that two separate insuring provisions of the Bond cover its losses on the falsified leases. The Bank first contends that it has coverage under Insuring Clause (D) of the Bond, which provides:

(D) FORGERY OR ALTERATION

Loss resulting directly from

(1) Forgery or alteration of, on, or in, any Negotiable Instrument (except an Evidence of Debt), Acceptance, Withdrawal Order, receipt for the withdrawal of Property, Certificate of Deposit or Letter of Credit;

(2) transferring, paying or delivering any funds or Property or establishing any credit or giving any value on the faith of any written instructions or advices directed to the Insured and authorizing or acknowledging the transfer, payment, delivery or receipt of funds or Property, which instructions or advices purport to have been signed or endorsed by any customer of the Insured or by any banking institution but which instructions or advices either bear a signature which is a Forgery or have been altered without the knowledge and consent of such customer or banking institution. Telegraphic, cable or teletype instructions or advices, as aforesaid, exclusive of transmissions of electronic funds transfer systems, sent by a person other than the said customer or banking institution purporting to send such instructions or advices shall be deemed to bear a signature which is a Forgery.

---

1. The Bank claims that its damages are not limited to damages caused by the 83 leases currently in its possession, but the issue of damages is not before the Court on this motion.

A mechanically reproduced facsimile signature is treated the same as a handwritten signature.

Secondly, the Bank contends that its losses are covered under Insuring Clause (E), which provides:

### (E) FORGERY AND ALTERATION OF SECURITIES, ETC.

Loss resulting directly from the Insured having, in good faith, for its own or for the account of others, (1) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, any original

(a) Certificated Security,

(b) Document of Title,

(c) deed, mortgage or other instrument conveying title to, or creating or discharging a lien on, real property,

(d) Certificate of Origin or Title,

(e) Evidence of Debt,

(f) corporate, partnership or personal Guarantee,

(g) Security Agreement,

(h) written Instruction to the issuer of an Uncertificated Security requesting that the transfer, pledge, or release from pledge of the Uncertificated Security specified be registered,

(i) Statement of Uncertificated Security, which

(i) bears a signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety, guarantor, or of any person signing in any other capacity which is a Forgery, or

(ii) is altered, or

(iii) is lost or stolen;

(2) guaranteed in writing or witnessed any signature upon any transfer, assignment, bill of sale, power of attorney, Guarantee, endorsement or any items listed in (a) through (h) above;

(3) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of any item listed in (a) through (d) above which is a Counterfeit.

Actual physical possession of the items listed in (a) through (i) above by the Insured, its correspondent bank or other authorized representative, is a condition precedent to the Insured's having relied on the faith of such items.

A mechanically reproduced facsimile signature is treated the same as a handwritten signature.

### III. RULES OF CONSTRUCTION

This is a diversity case. It is governed by the law of Arkansas. *Am. Eagle Ins. Co. v. Thompson,* 85 F.3d 327, 330 (8th Cir.1996). The well-established rules of construction of an insurance contract were reiterated by the Arkansas Court of Appeals in *Anderson Gas & Propane, Inc. v. Westport Ins. Corp.,* 84 Ark.App. 310, 315, 140 S.W.3d 504, 507 (2004).

The language in an insurance policy is to be construed in its plain, ordinary, popular sense. If a policy provision is unambiguous, and only one reasonable interpretation is possible, the court will give effect to the plain language of the policy without resorting to rules of construction. Language is ambiguous if there is doubt or uncertainty as to its meaning, and it is fairly susceptible to more than one reasonable interpretation. If the policy language is ambiguous, the policy will be construed liberally in favor of the insured and strictly against the insurer.... Whether the language of a policy is ambiguous is a question of law to be resolved by the court.... The terms of an insurance contract are not to be rewritten under the rule of strict construc-

tion against the company issuing it so as to bind the company to a risk that is plainly excluded and for which it was not paid.

*Id.* at 315, 140 S.W.3d at 507 (internal citations omitted).

## IV. INTERPRETATION OF THE POLICY

### A. *Whether These Documents Are Covered.*

The threshold question is whether the form of lease upon which the Bank relied in disbursing funds under the revolving line of credit is one of the items covered by Insuring Clauses (D) and (E).

#### (1) *Insuring Clause D.*

■ Insuring Clause (D) provides coverage for the loss resulting directly from "Forgery or alteration of, on, or in, any Negotiable Instrument (except an Evidence of Debt), Acceptance, Withdrawal Order, receipt for the withdrawal of Property, Certificate of Deposit, or Letter of Credit." The Bank contends that the falsified leases were Negotiable Instruments. The Bond defines Negotiable Instrument as follows:

(o) Negotiable Instrument means any writing

(1) signed by the maker or drawer; and

(2) containing any unconditional promise or order to pay a sum certain in Money and no other promise, order, obligation or power given by the maker or drawer; and

(3) is payable on demand or at a definite time; and

(4) is payable to order or bearer.

The form of lease is not a Negotiable Instrument as defined in the Bond. It does not contain an unconditional promise to pay a sum certain; instead, the promise to pay is conditioned upon delivery of the copy machine. The lease contains other promises and obligations of the lessee, including promises to pay all taxes, assessments, fees, and penalties that may be levied against the leased property and a promise to keep the leased property insured in the name of the lessor, at the lessee's expense. Furthermore, the lease was not payable to order or bearer. As a matter of law, the form of lease is not a Negotiable Instrument as defined by the Bond in plain and unambiguous terms. Consequently, St. Paul is entitled to judgment as a matter of law on the Bank's claims under Insuring Clause (D).

#### (2) *Insuring Clause (E).*

■ With respect to Insuring Clause (E), the Bank contends that the form of lease falls within the definition of a Certificated Security, a Document of Title, an Evidence of Debt, and a Security Agreement. The Bond defines the term Certificated Security as follows:

(d) Certificated Security means a share, participation or other interest in property of, or an enterprise of, the issuer or an obligation of the issuer, which is:

(1) represented by an instrument issued in bearer or registered form;

(2) of a type commonly dealt in on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and

(3) either one of a class or series or by its terms divisible into a class or series of shares.

The lease does not meet this definition. It is not represented by an instrument issued in bearer or registered form. It is not the type of document commonly dealt in on securities exchanges or markets or commonly recognized or dealt in as a medium for investment. As a matter of law, the

lease does not qualify as Certificated Securities under Insuring Clause (E).

■ The Bond defines Document of Title as follows:

(f) Document of Title means a bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers and must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.

The form of lease at issue here is not a bill of lading, dock warrant, dock receipt, warehouse receipt, or order for the delivery of goods; nor is it a document that in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold, and dispose of the document and the goods it covers. Each lease at issue here was first held by Croy, but the lease was not evidence that Croy was entitled to receive, hold and dispose of the copy machine covered by such a lease. So long as the lease was in effect, and so long as the lessee was not in default, Croy was not entitled to hold, receive, and dispose of the copy machine. Furthermore, Croy delivered the leases to the Bank. However, possession of such a lease by the Bank was not evidence that the Bank was entitled to receive, hold, and dispose of the copy machines at issue. So long as the lessee fulfilled its obligations under the lease, and so long as the lease was in effect, the lessee was entitled to hold the copy machines, not Croy, and not the Bank. As a matter of law, the form of lease is not a

Document of Title within the meaning of the Bond.

■ The form of lease is not an Evidence of Debt. The Bond defines Evidence of Debt as follows:

(h) Evidence of Debt means an instrument, including a Negotiable Instrument, executed by a customer of the Insured and held by the Insured which in the regular course of business is treated as evidencing the customer's debt to the Insured.

To be an Evidence of Debt, the lease would have to evidence Croy's debt to the Bank. In fact, each lease is evidence, or purports to be evidence, of the lessee's debt to Croy, not Croy's debt to the Bank. The Bank contends that each lease is evidence of Croy's debt to it because it would not have had the leases but for Croy's debt; but that is plainly not what the Bond contemplates when it uses the term "Evidence of Debt." The reality is that the Bank took possession of each lease as evidence of the amount that the lessee owed Croy and as security for the amount that the Bank would lend Croy after determining how much the lessee owed Croy. As a matter of law, the form of lease is not an Evidence of Debt within the meaning of the Bond.

■ The Bond defines Security Agreement as "an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation." The leases at issue meet this definition. Each lease creates a leasehold interest in a copy machine, so each lease creates an interest in personal property. Each lease secures payment of the lessee's obligation. Paragraph 14 of the lease agreement gives the lessor the right, upon lessee's default, under certain conditions, to repossess the equipment; and it requires the lessee to pay the amount in arrears, the expense of retaking

possession and removing equipment, court costs and reasonable attorney's fees, in addition to a sum equal to the balance of the rent and other payments for the remainder of the term. The provisions in paragraph 14 of the lease agreements are common in instruments that secure payment of an obligation. St. Paul argues that a lease may not be characterized as a Security Agreement unless there is no residual value to the lessor at the end of the lease term and points the Court to Ark. Code Ann. § 4–1–201, cmt. 37 and § 4–2A–103, cmt. j. The definition in the Bond is not ambiguous, so it would be improper to look to extrinsic sources to determine the meaning of the definition.[2] The form of lease at issue is plainly and unambiguously a Security Agreement as that term is defined in the Bond.

## B. Whether Insuring Clause (E) Provides Coverage.

The Bank contends that the leases were forged, altered, and counterfeited. Hence, the Bank seeks coverage under Insuring Clause (E)(1)(i), (E)(1)(ii), and E(3).

### (1) Counterfeit Coverage.

■ Insuring Clause (E)(3) provides counterfeit coverage only for a(a) Certificated Security, (b) Document of Title, (c) deed, mortgage or other instrument conveying title to, or creating or discharging a lien on, real property, or (d) Certificate of Origin or Title. As a matter of law, the form of lease at issue is none of these things. Consequently, as a matter of law,

Insuring Clause (E)(3) does not provide counterfeit coverage for the falsified leases. St. Paul is entitled to judgment as a matter of law on the Bank's claim for counterfeit coverage for the falsified leases.

### (2) Alteration Coverage.

■ Insuring Clause (E)(1)(ii) provides that St. Paul will indemnify the Bank for loss resulting directly from the Bank having extended credit on the faith of any original Security Agreement that is altered. Actual physical possession of the Security Agreement by the Bank is a condition precedent to the Bank's having relied on the faith of the Security Agreement. The Bank argues that the lease agreements it received were alterations of the true leases between Croy and the various state agencies. On that argument, the purchase orders—which were the true leases—would be the altered documents. However, the Bank did not have possession of the purchase orders and did not extend credit on the faith of the purchase orders. The Bank extended credit on the faith of the falsified leases, and it had the originals of those documents in its possession. Insuring Clause (E)(1)(ii) requires that the original documents—the ones in the possession of the insured—have been altered. The Bank construes the Bond to cover an altered agreement as opposed to an altered document; but the text is not susceptible to that interpretation. The documents in the Bank's possession, on the faith of which it extended credit, had not

---

**2.** The Bank contends that the copy machines were worthless by the time the leases expired and cites deposition testimony of Ralph Croy as an exhibit to its response to the motion for summary judgment. St. Paul has moved to strike that exhibit on the ground that Croy was not identified as an expert. The Court's holding renders the motion to strike moot. Otherwise, the Court would deny the motion

to strike because the trial has been continued, and the deadline for identifying experts can be extended. · Croy's testimony is sufficient to create a fact question on the issue of whether the copy machines had residual value at the end of their lease terms so summary judgment would be denied even if the Court used the UCC to decide whether the form of lease is a Security Agreement.

been altered. St. Paul is entitled to judgment as a matter of law on the Bank's claim under Insuring Clause (E)(1)(ii).

### (3) *Forgery Coverage.*

The remaining issue is whether St. Paul is entitled to judgment as a matter of law on the Bank's claim for forgery coverage under Insuring Clause (E)(1)(i). The Bond defines Forgery as follows:

> (i) Forgery means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

It is undisputed that Forgery occurred with respect to some of the leases at issue.[3] Brown or another employee of Croy signed the name of a purported representative of the agency leasing the copy machine on a number of the leases at issue. The Bank concedes that signatures were not forged on more than half of the 83 leases but contends that all of the leases represent "document forgery." The Bank argues that the Court should look to the definition of forgery in the Arkansas Criminal Code at Ark.Code Ann. § 5–37–201(a), which provides that a person forges a written instrument if with purpose to defraud he draws, makes, completes, alters, counterfeits, possesses, or utters a written instrument that purports to be the act of a person who did not authorize that act. By that definition, all 83 of the falsified leases would constitute forgeries: they would be forged documents whether or not they contained forged signatures. However, the term Forgery is defined in the Bond. It is defined in terms that are plain and unambiguous. "Forgery means the sign-

ing of the name of another person or organization...." It would be improper to go beyond the terms of the Bond and look to a criminal statute to find a broader definition than the definition in the contract to which the parties agreed. *Edgley v. Lappe,* 342 F.3d 884, 888–90 (8th Cir. 2003); *Baltimore Bank & Trust Co. v. United States Fid. & Guar.,* 436 F.2d 743, 746 (8th Cir.1971); *United Pac. Ins. Co. v. Idaho First Nat'l Bank,* 378 F.2d 62, 67 (9th Cir.1967).

With respect to the leases that contained forgeries within the definition of the Bond, St. Paul contends that it is entitled to summary judgment because the purported signor was not authorized to sign leases on behalf of the lessees. St. Paul's argument is that, to establish coverage, it is not sufficient merely to show the Bank extended credit on the faith of a covered document that contained a forgery; an insured must also show, under Insuring Clauses (D) and (E), that the Forgery caused the loss. In this case, St. Paul argues, the Bank would have suffered the same losses even if the signatures on the falsified leases had been authentic because the persons whose names were signed as representatives of the different state agencies did not have the authority to bind the state agencies since they were not purchasing officials. *See* Ark.Code Ann. §§ 19–11–201, 19–11–203(1), 19–11–203(20)(a), and 19–11–220. As authority for this argument, St. Paul cites *Liberty Nat'l Bank v. Aetna Life & Cas. Co.,* 568 F.Supp. 860 (D.N.J. 1983); *Reliance Ins. Co. v. Capital Bancshares, Inc./Capital Bank,* 685 F.Supp. 148 (N.D.Tex.1988); and *KW Bancshares v. Syndicates of Underwriters,* 965 F.Supp. 1047 (W.D.Tenn.1997).

---

**3.** As noted above, the Bank's attorney stated in oral argument that there are 39 leases with respect to which either it is undisputed that signatures were forged or the Bank has some evidence that signatures were forged.

To assess the validity of this argument, it will be necessary to parse in more detail the sentence that constitutes the substance of Insuring Clause (E). Stripped of those terms that are irrelevant to the present case or have been eliminated from consideration elsewhere in this opinion, Insuring Clause (E)(1)(i) provides that St. Paul will indemnify the insured for:

> Loss resulting directly from the Insured having, in good faith, for its own account ... (1) ... extended credit ... on the faith of, any original ... (g) Security Agreement, ... which (i) bears a signature of any ... lessee ... or of any person signing in any other capacity which is a Forgery[.]

Thus, the elements that the Bank must establish in order to show coverage under this clause are: (1) a loss; (2) directly resulting from the insured having, in good faith,[4] extended credit; (3) on the faith of an original security agreement; (4) which bears a forged signature of a lessee.

The policy does not define the phrase "loss resulting directly." In another context, the Arkansas courts have held that a direct loss is one proximately caused by the hazard insured against. *Southall v. Farm Bureau Mut. Ins. Co. of Ark.*, 276 Ark. 58, 60, 632 S.W.2d 420, 422 (1982); *Home Mut. Fire Ins. Co. v. Jones*, 63 Ark.App. 221, 228, 977 S.W.2d 12, 15 (1998). Other courts have held that the phrase "result directly from" is equivalent to proximate causation. *Bidwell & Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 2001 WL 204843 at *9 (D.Or. Jan.18, 2001). *See also Auto Lenders Acceptance Corp. v. Gentilini*, 181 N.J. 245, 854 A.2d 378, 385–87 (2004). The view that "resulting directly from" is equivalent to proximate causation is consistent with BLACK'S LAW DICTIONARY (8th Ed.2004), which, in the entry for *direct cause* refers the read-

er to the entry for *proximate cause* under CAUSE (1). The entry for *proximate cause* includes the following definition: "[a] cause that directly produces an event and without which the event would not have occurred." *Id.* at 234. It is well settled that an event can have more than one proximate cause.

■ Here, it is undisputed that the Bank suffered a loss. The undisputed facts show that the loss resulted directly from the Bank having extended credit on the faith of a Security Agreement which bears a signature of a lessee or another person which is a forgery. The loss occurred directly from the fact that the Bank extended credit on the faith of the leases. Those leases contained forged signatures. Insuring Clause (E)(1)(i) requires no more.

■ The gist of St. Paul's argument is that Insuring Clause (E) provides no coverage unless the Forgery was the sole cause of the loss. But, as noted by an article that endorses the argument of St. Paul, "[t]here is, of course, no literal requirement in either Clause (E) or Section 2(e) that only the forgery must cause the loss." Peter C. Haley, *Clause (E): The Continued Importance of Defined Terms and Causation Requirements*, FINANCIAL INSTITUTION BONDS 284 (Duncan L. Clore ed., 2nd ed.1998). Since the Bond does not provide that the Forgery must be the sole cause of the loss for there to be coverage, the Court cannot accept St. Paul's argument. To do so would require the Court to read into the contract between the parties a provision that the contract does not contain.

The argument adopted by *Liberty National Bank, Reliance Ins. Co.*, and *KW Bancshares* is that Section 2(e) of the ex-

---

4. St. Paul does not dispute the fact that the Bank extended credit to Croy in good faith.

clusions amends Insuring Clause (E). Section 2(e) provides:

This Bond does not cover:

\* \* \* \* \* \*

(e) loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any Loan or transaction involving the Insured as a lender or borrower, or extension of credit, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or Evidences of Debt, whether such Loan, transaction or extension was procured in good faith or through trick, artifice, fraud or false pretenses, except when covered under Insuring Clauses (A), (D), (E), or (N)[.]

In *Liberty National Bank,* the court reasoned:

The Bond distinguishes between the "risk of authentication" (forgery and counterfeiting) against which the Bank could not reasonably protect itself and the credit risk posed by worthless collateral. Thus, Insuring Agreements D and E protect against risks of authentication and genuineness. Section 2(e) *excludes* credit risks.... Given this division of risks within the Bond, the court concludes that the parties intended that the Bank would assume the risk of the collateral being worthless.

568 F.Supp. at 866 (emphasis in the original). Based on that analysis of the relationship between Section 2(e) of the Exclusions and Insuring Clauses (D) and (E), the court held:

It is undisputed that the events which culminated in the Bank's loss were permeated by fraud, whatever the exact details. It must be emphasized, however, that a loss caused by fraud or false pretenses is expressly excluded from coverage by Section 2(e) *unless* the

fraud can be classified as forgery or counterfeiting and the forgery or counterfeiting causes the loss or unless the fraud results from the actions of a dishonest employee.

*Id.* at 866–67 (emphasis in the original). The key to the court's holding in *Liberty National Bank* is the portion of the last sentence stating, "and the forgery or counterfeiting causes the loss...." *Id.* at 867. That phrase is not in Insuring Clause (E), nor does Section 2(e) amend Insuring Clause (E) to add that language. *Liberty National Bank* adds, as a prerequisite for coverage, a requirement that the Forgery cause the loss. That requirement is not stated in the Bond.

The argument that Section 2(e) amends Insuring Clause (E) is further defended and explained in the article by Peter C. Haley. Haley writes:

*Liberty National* ... is interesting because it interprets Clause (E) together with the "loan exclusion," Section 2(e). Indeed, according to *Liberty National,* Clause (E) is a limited exception to the loan exclusion ("a loss caused by fraud ... is excluded ... unless the fraud can be classified as forgery or counterfeiting and the forgery or counterfeiting causes the loss...."). That is not the way insurance policies are normally interpreted; in most cases, exclusions are treated as narrowly construed exceptions to liberally construed insuring agreements. *Liberty National* in effect reverses this rule by harmonizing Clause (E) with Section 2(e).

\* \* \* \* \* \*

Insureds, of course, continue to assert that Clause (E) is not an exception to an exclusion, but rather an affirmative coverage provision that should be liberally interpreted. By "liberally" is meant an interpretation that construes the literal words of Clause (E): ("Loss directly

resulting from the insured having ... extended credit ... on the faith of any original ... Security Agreement ... which bears a signature ... which is a forgery.") Insureds further argue that there is no need to "harmonize" Clause (E) with Section 2(e), because Section 2(e) specifically states that it does not apply to claims otherwise covered under Insuring Agreements (A), (D) or (E). Interpreted this way, Clause (E) provides coverage for the insured's good faith reliance on *documents* which were forged, as opposed to its good faith reliance on the single fact that the documents contained genuine signatures. There is, of course, no literal requirement in either Clause (E) or Section 2(e) that only the forgery must cause the loss.

But this theory has been rejected overwhelmingly.[5] Courts have emphasized the broad reach of Section 2(e), and have refused to interpret the causation requirement of Clause (E) in a vacuum. Thus, in a loan loss case, the insured must show "loss causation" as well as "transaction causation." That is, the insured must show that (a) it would not have made the loan in question had it been aware that forged documents were being pledged as loan security, and (b) absent the forgery, the documents would have had real monetary value, thus causing an economic loss to the insured as a direct result of the forgery. This test insures that the loss will directly result only from an act of forgery rather than from a borrower's more generalized transactional fraud; transactional fraud is excluded from coverage, but discrete acts of forgery are not. Any other test would read Section 2(e) out of the Bond entirely in connection with Clause (E) claims, a fact recognized by *Liberty National* and its progeny.

Haley, *supra* at 283–85 (emphasis in the original).

One difficulty with following *Liberty National Bank* here is that the Court is obligated to apply Arkansas law. Under Arkansas law, exclusions in an insurance policy must be strictly construed against the insurer, with all reasonable doubts in favor of the insured. *Bruce Oakley, Inc. v. Farmland Mut. Ins. Co.*, 245 F.3d 1027, 1029 (8th Cir.2001). As Haley observes, *Liberty National Bank* does not interpret the Bond "in the way insurance policies are normally interpreted." Instead of treating Section 2(e) as a narrowly construed exception to liberally construed insuring agreements, *Liberty National Bank* in effect reverses the rule. Arkansas law does not authorize this Court to follow *Liberty National Bank's* lead in reversing the way in which insurance policies are normally interpreted.

Another difficulty with the argument adopted in *Liberty National Bank* and defended by Haley is that the Bond, itself, reads Section 2(e) out of the Bond entirely in connection with Insuring Clause (E) claims. Section 2(e) says that the Bond does not cover losses from loans or extensions of credit "except when covered under Insuring Clauses (A), (D), (E), or (N)[.]" This language is plain and unambiguous. It is unnecessary to resort to the rule that exclusions must be strictly construed to hold that Section 2(e) does not amend In-

---

**5.** Although Haley says that the theory has been rejected "overwhelmingly," there are only four published opinions that discuss the issue. All four are from district courts. In addition to *Liberty National Bank, Reliance,* and *KW Bancshares,* the only other case that discusses the issue is *French Am. Banking Corp. v. Flota Mercante Grancolombiana,* 752 F.Supp. 83 (S.D.N.Y.1990). *KW Bancshares* and *French Am. Banking Corp.* cite *Liberty National Bank.*

 

suring Clause (E). The exclusion contained in Section 2(e) does not apply to Insuring Clause (E). Perhaps it should. But it doesn't.

## CONCLUSION

For the reasons stated above, St. Paul's motion for summary judgment (Docket # 19) is granted in part and denied in part. Summary judgment is granted in favor of St. Paul on the Bank's claims under Insuring Clause (D). As a matter of law, the form of the lease in question is not a Negotiable Instrument or other document covered by Insuring Clause (D). Summary judgment is granted in favor of St. Paul on the Bank's claims for coverage under Insuring Clause (E)(3) because the form of lease in question, as a matter of law, is not a(a) Certificated Security; (b) Document of Title; (c) deed, mortgage or other instrument conveying title to, or creating or discharging a lien on, real property; or (d) Certificate of Origin or Title. Summary judgment is granted in favor of St. Paul on the Bank's claims as to the leases that the Bank characterizes as document forgeries but as to which there is no evidence of a forged signature. As a matter of law, the Court must apply the definition of Forgery that is contained in the Bond and may not use a definition contained in the Arkansas criminal statutes to expand coverage. The definition of Forgery in the Bond requires the forgery of a signature. Summary judgment is denied as to the leases for which there is evidence of a forged signature. St. Paul's argument that no coverage is afforded unless the forgery was the sole cause of the loss is contrary to the plain and unambiguous language of the Bond.

St. Paul's motion to strike plaintiff's Exhibit C to its response to the motion for summary judgment (Docket # 32) is denied as moot.

IT IS SO ORDERED this *20th* day of October, 2004.