# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-3324
_____

BancInsure, Inc.

*Plaintiff - Appellee*

v.

Highland Bank

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: June 10, 2014
Filed: March 3, 2015

_____

Before LOKEN, BEAM, and GRUENDER, Circuit Judges.

_____

LOKEN, Circuit Judge.

BancInsure, a licensed Oklahoma insurance company, denied a claim by Highland Bank, a Minnesota corporation, under a Financial Institution Bond issued by BancInsure to Highland Bank. In this diversity action, BancInsure seeks a declaratory judgment that Highland Bank's claim did not fall within the coverage

terms of the Bond. Ruling on cross motions for summary judgment, the district court[1] granted summary judgment to BancInsure. Applying Minnesota law, the court ruled that Highland Bank's claim was not covered by the Bond's "Insuring Agreement E" which, as relevant here, provided coverage for "Loss resulting directly from the Insured having . . . acquired, sold or delivered, given value, extended credit or assumed liability on the faith of any original . . . personal Guarantee . . . which bears a signature of any . . . guarantor . . . which is a Forgery." Here, the court concluded, the loss did not "result directly from" a forged personal guaranty because the guaranty was worthless to the bank when it entered into the transactions in question. See BancInsure, Inc. v. Highland Bank, No. 11-cv-2497, 2013 WL 5340887, at *6-8 (D. Minn. Sept. 23, 2013). Highland Bank appealed.

While the appeal was pending, BancInsure (now known as Red Rock Insurance Company) was placed into receivership by an Oklahoma state court, and the court appointed the Oklahoma Insurance Commissioner as Receiver under a final order of liquidation. After staying the appeal "to permit proper legal action by the Receiver," we directed the parties "to advise the court . . . how they believe the court should proceed," with notice to the Insurance Commissioner as Receiver because no motion for substitution had been filed. The parties promptly filed a joint request "that the Court complete the appeal." We have done so and now affirm.

## I. Background

**A. The Underlying Transactions.** In May 2005, First Premier Capital ("FPC"), an equipment lease finance company located in Minnesota, entered into a Master Lease Agreement with Equipment Acquisition Resources ("EAR"), a Chicago-based enterprise engaged in the business of refurbishing and selling or leasing high-

---

[1]The Honorable Susan Richard Nelson, United States District Judge for the District of Minnesota.

tech machinery used in the semiconductor industry. Sheldon Player and Donna Malone, who were married, each owned 50% of EAR. The Master Lease Agreement provided that FPC would lease to EAR equipment described in one or more Lease Schedules. Each Lease Schedule "would constitute a separate, distinct, and independent lease." Player signed the Master Lease on behalf of EAR. FPC received separate Absolute, Unconditional and Continuing Guaranty Agreements signed by Player and by Malone guaranteeing payment "of all of the obligations and liabilities of [EAR] under the Lease, both present and future," and explicitly made enforceable by FPC's "successors and assigns."

FPC and EAR executed some twenty Lease Schedules pursuant to the Master Lease Agreement, leasing specific equipment to EAR at specified terms and monthly lease charges. To finance its equipment purchases, FPC assigned its right to payments under each Lease Schedule to one of eight or ten "bank partners." Highland Bank purchased assignments of the lease payments under three Lease Schedules, entering into, with respect to each, a Collateral Assignment of Lease Payments and Equipment with FPC. Highland Bank paid FPC $2,958,830.64 to purchase the assignment of lease payments under Lease Schedule 005R in October 2006; $507,523.40 for lease payments under Lease Schedule 008R in April 2007; and $527,660.59 for lease payments under Lease Schedule 009R in May 2007.

Each Collateral Assignment agreement provided that Highland Bank would pay FPC the Assignment Price in exchange for "the transfer and collateral assignment of all lease payments as outlined on the attached amortization schedule." FPC promised that it would "continue to fulfill all obligations and responsibilities of the Lessor under the Lease." FPC also explicitly assigned its ownership interest in the leased equipment to Highland Bank, and warranted that "[t]he Lease and any accompanying guaranties . . . are genuine and enforceable in accordance with their terms." FPC purchased the leased equipment at the direction of EAR, usually from a distributor named Machine Tools Direct ("MTD"). MTD delivered the equipment directly to

EAR at its facility in suburban Chicago. Highland Bank did not inspect the purchased equipment and had no direct contact with EAR, Player, or Malone.

Before entering into the Collateral Assignment agreements and funding the equipment purchases, Highland Bank reviewed copies of the Master Lease and Lease Schedule documents, including copies of the personal guaranties of Player and Malone, certified by FPC. FPC retained the document originals and did not disclose how many other Lease Schedules had been or would be assigned to other banks. Highland Bank officers testified, without contradiction, that the Bank would not have entered into the Collateral Assignments if Player and Malone had not provided the personal guaranties FPC required as part of the May 2005 Master Lease Agreement.

Before the initial Collateral Assignment in October 2006, FPC sent Highland Bank financial information provided by EAR, including a joint personal financial statement of Player and Malone dated December 1, 2005. Highland Bank's Credit Presentation to its Credit Committee reported "Guarantor Support" as the "Tertiary Repayment Source" for the transaction, after "Business Cash Flow" and "Collateral Liquidation." The "Guarantor Financial Analysis" of Player and Malone reported total assets of $63,980,000, of which $47,000,000 was the "Value" of EAR; a *negative* after-tax tangible net worth of $4,580,000; and $38,811,683 in contingent liabilities (guaranties of EAR debts). The personal cash flow of $249,689 in 2004 was almost entirely wage income from EAR.

**B. The Loss.** EAR made all required payments under the three Lease Schedules until well into 2009. Highland Bank received more than $2,600,000 in lease payments. In September 2009, EAR ceased making lease payments and soon filed for Chapter 11 bankruptcy protection in the Northern District of Illinois. The summary judgment record on appeal includes a report by the bankruptcy Plan Administrator's expert in the Chapter 11 proceedings describing the "Ponzi scheme" fraud that resulted in EAR's demise and Highland Bank's loss:

-4-

EAR's fraudulent scheme generally involved it purchasing high-tech equipment near the end of its life-cycle at extremely low prices relative to the cost of a new unit. EAR then sold that same piece of equipment to a shill company [MTD] at dramatically more than the price EAR had paid for the piece of equipment.

EAR concurrently entered into purchase and lease transactions with financial institutions. MTD would sell the piece of equipment to the financial institution purchaser and then EAR would enter into a lease whereby EAR would make lease payments to the financial institution purchaser. The purchase price was dictated by the artificial, high invoice issued by MTD.

Further, EAR commonly sold the same piece of equipment to multiple financial institution purchasers, and thus pledged a piece of equipment to multiple financial institution purchasers or created fictitious pieces of equipment.

EAR received the proceeds from the lenders' purchase of the equipment - less a cut for MTD [-] and used the proceeds to pay EAR's lease obligations, purchase non-business related assets, fund distributions to shareholders, and, inter alia, make direct payments to casinos for gaming activities by the principals of the company and others.

Evidence of the fraud goes back at least to 2003. For the period from 2005 through the date of the bankruptcy filing in late 2009, there appears to be a limited amount of legitimate business activity.

In December 2009, Highland Bank determined that unpaid lease payments under the Collateral Assignment agreements were uncollectible and wrote off a loss of $2,011,618.30. Highland Bank sued FPC and filed a claim in EAR's bankruptcy, ultimately receiving a settlement of $48,715.20 that reduced its claim under the BancInsure Bond. Highland Bank took no action against either Player or Malone. In July 2010, Highland Bank was advised that the signature on Donna Malone's personal guaranty was likely forged. Highland Bank notified BancInsure. Malone filed for

personal bankruptcy protection in September 2010, declaring assets of $5,400 and liabilities of more than $100,000,000. In January 2011, she executed an Affidavit of Forgery averring that "[t]he signature on the Guaranty purporting to be of 'Donna Malone' is not my signature, and is a forgery," and that she had no knowledge that EAR and FPC entered into the Master Lease and guaranty agreements in May 2005. Also in January 2011, Highland Bank filed a proof of loss supporting its claim under the Bond. BancInsure denied coverage in August 2011. This declaratory judgment action followed.

## II. Discussion

**A.** BancInsure's Financial Institution Bond, often referred to as a bankers blanket bond, is a version of a standard form bond initially drafted by the Surety Association of America in 1916 and modified from time to time with input from the American Bankers Association. See First Nat'l Bank of Manitowoc v. Cincinnati Ins. Co., 485 F.3d 971, 977 (7th Cir. 2007). The Bond contains multiple Insuring Agreements "that cover a variety of risks such as misconduct by bank employees; forged, altered, or fraudulent securities and instruments; and counterfeit currency." Ohio Sav. Bank v. Progressive Cas. Ins. Co., 521 F.3d 960, 962 (8th Cir. 2008).

"The Bankers Blanket Bond is designed to protect a bank against risks of dishonesty, both external and internal, but does not insure good management nor against the risk of loss inherent in the banking operations." Nat'l City Bank of Mpls. v. St. Paul Fire & Marine Ins. Co., 447 N.W.2d 171, 177 (Minn. 1989) (quotation omitted); see Republic Nat'l Bank of Miami v. Fid. & Deposit Co. of Md., 894 F.2d 1255, 1263 and cases cited (11th Cir. 1990) ("a banker's blanket bond is not a policy of credit insurance and does not protect the bank when it simply makes a bad business deal"). Reflecting this principle, Exclusion (e) of BancInsure's Bond excluded from coverage:

-6-

loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any Loan or transaction involving the Insured . . . except when covered under Insuring Agreement (A), (D), (E), (P) or (Q).

Only Insuring Agreement E is at issue on this appeal. Although BancInsure has asserted other defenses, the appeal turns on whether the district court correctly determined that Highland Bank's loss was not covered under Insuring Agreement (E) because it was not a "Loss resulting directly from the [Bank] having . . . given value, extended credit or assumed liability on the faith of" Donna Malone's May 2005 Guaranty Agreement with FPC, even if that document was a "personal guaranty" and the guarantor's signature was a "forgery," as those terms were defined in the Bond.

**B.** Highland Bank contends that its loss "resulted directly from" Donna Malone's forged personal guaranty because it is undisputed that Highland Bank would not have entered into the Collateral Assignment agreements with FPC had Player and Malone not personally guarantied the obligations of EAR under the Master Lease Agreement. BancInsure argues that Highland Bank's loss did not result directly from the forged personal guaranty because even if the guaranty were genuine, Highland Bank would have suffered the same loss. This is an issue of loss causation. As the Supreme Court explained in Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268 (1992), at common law the concept of proximate cause "was a demand for some direct relation between the injury asserted and the injurious conduct alleged." We are inclined to agree with the Third Circuit's observation that "the phrase 'resulting *directly* from' in the [Bond] does suggest a stricter standard of causation than mere 'proximate cause.'" Jefferson Bank v. Progressive Cas. Ins. Co. 965 F.2d 1274, 1281 (3d Cir. 1992) (emphasis in original). Thus, by using the phrase "Loss

resulting directly from," Insuring Agreement E unambiguously demands no less than the direct relationship reflected in the principle of proximate cause.[2]

The text of Insuring Agreement E raises a crucial question -- must the loss "result directly from" the fact that Malone's guaranty was forged, so that an otherwise worthless guaranty does not trigger coverage, or is it sufficient that Highland Bank would not have entered into the transactions with FPC that ultimately resulted in the loss had FPC not obtained Malone's personal guaranty? To state the issue differently, although the existence of the personal guaranties was a "but-for" cause of Highland Bank entering into the Collateral Assignment agreements with FPC, was the forged Malone guaranty a proximate cause of the loss, that is, a substantial factor in bringing about the resulting harm? To answer this difficult question, the district court properly looked to a recent unpublished decision of the Minnesota Court of Appeals that was almost directly on point, Alerus Financial National Association v. St. Paul Mercury Insurance Co., No. A11-680, 2012 WL 254484 (Minn. Ct. App. Jan. 30, 2012).

In Alerus, a businessman engaged in elaborate fraud obtained five loans from participating banks providing, as collateral, corporate guaranties and stock from a sham company. When the fraud collapsed and the banks could not collect the loans, they made claims under financial institution bonds based in part on the fact that the stock certificates and corporate guaranties bore forged signatures. Alerus, 2012 WL 254484, at *1, *5. The Hennepin County District Court, applying the Supreme Court of Minnesota's decision in National City Bank, 447 N.W.2d at 177, concluded that

---

[2]By contrast, the Seventh Circuit in Manitowoc construed the phrase "loss *by reason of*" the insured's reliance on forged documents in the Insuring Agreement E at issue in that case as requiring proof of only but-for causation. 485 F.3d at 980 (applying Wisconsin law). We agree with the district court that this difference in a critical term of the bond is highly significant. As the Seventh Circuit observed, "case law interpreting one revision [of the standard Bankers Blanket Bond] may be unhelpful or even irrelevant to the task of interpreting another." Id. at 977.

Minnesota would follow the majority rule from other jurisdictions that there is no coverage under Insuring Agreement E for losses resulting from forged documents if the insured would have sustained the same loss had the documents been genuine. Alerus Fin. N.A. v. St. Paul Mercury Ins. Co., No. 27-CV-09-3344, slip op. at 28-34 (Minn. Dist. Jun. 28, 2010). The Minnesota Court of Appeals agreed, denying coverage because the banks' "losses did not result directly from the forgeries, but rather from the worthlessness of the TCA guaranties and stock." Alerus, 2012 WL 254484, at *6. In arriving at this conclusion, the Court "adopt[ed the] majority rule" that "loan loss is not directly caused by reliance on forgeries in documents constituting or referencing collateral when the collateral is worthless at the time of the loan." Id. at *5, citing Bank of Bozeman v. BancInsure, Inc., 404 F. App'x 117, 119 (9th Cir. 2010); KW Bancshares, Inc. v. Syndicates of Underwriters at Lloyd's, 965 F. Supp. 1047, 1054-55 (W.D. Tenn. 1997); French Am. Banking Corp. v. Flota Mercante Grancolombiana, S.A., 752 F. Supp. 83, 91 (S.D.N.Y. 1990); Liberty Nat'l Bank v. Aetna Life & Cas. Co., 568 F. Supp. 860, 866-67 (D.N.J. 1983).[3]

"Persuaded by the holding in Alerus," the district court concluded that uncontroverted facts demonstrate "that the Malone guaranty and the collateral were worthless when Highland Bank extended credit" because Highland Bank's credit presentations showed that Malone and Player had a substantial negative tangible net

---

[3]The court explained the governing loss-causation distinction in Liberty National Bank, 568 F. Supp. at 863:

> In this particular case, the documents relied upon were not counterfeit but may have been forged. But even if counterfeit *and* forged, the loss sustained by the Bank was not caused by the lack of authenticity or genuineness of the documents. On the contrary, the loss was caused by the fact that the statements contained in the documents were not true. The assets represented thereby did not exist. If the documents were authentic and their signatures genuine and authorized, the loss nonetheless would have occurred.

worth and contingent liabilities of over $38 million at the time of the first loan; the bank's chief credit officer subsequently reported that the loan collateral did not exist; and an expert report concluded that EAR was insolvent beginning in 2005. BancInsure, 2013 WL 5340887, at *7. The court also ruled "that Highland Bank cannot show reliance on the Malone guaranty because it never obtained a legal interest in the guaranty," id. at *8, citing Republic National Bank, 894 F.2d at 1263 (for coverage under Insuring Agreement E, the insured "must establish that it relied on" the forged document). Accordingly, the court concluded, "Insuring Agreement E does not cover Highland Bank's claims in this matter." 2013 WL 5340887, at *11.

**C.** On appeal, Highland Bank argues the district court "gave the unpublished court of appeals decision in Alerus undue import." As a federal court exercising diversity jurisdiction, we are not bound to follow the decisions of an intermediate state appellate court when interpreting state law, but those decisions should be followed when they are the best evidence of state law. See Grinnell Mut. Reinsur. Co. v. Schwieger, 685 F.3d 697, 703 n.5 (8th Cir. 2012). Here, the opinions of the Minnesota District Court and Court of Appeals in Alerus were thorough and well reasoned. The courts adopted the majority rule from other jurisdictions, and applied the Supreme Court of Minnesota's decision in National City Bank, 447 N.W.2d at 177, just as we had applied that decision in Ohio Savings Bank, 521 F.3d at 964. Like the district court, we conclude that the majority rule adopted in Alerus, based on the well-settled principle that "the standard bankers bond is not a form of credit insurance," Liberty National Bank, 568 F. Supp at 866, is the best evidence of Minnesota law as the Supreme Court of Minnesota would apply it.

More specifically, Highland Bank urges that we reject Alerus and adopt the reasoning of Pine Bluff National Bank v. St. Paul Mercury Insurance Co., 346 F. Supp. 2d 1020 (E.D. Ark. 2004). In Pine Bluff, the bank extended credit to a copy machine vendor, taking as collateral assignments of lease payments owed by the vendor's state agency customers. To obtain more credit, the dishonest vendor

delivered to the bank lease forms showing an exaggerated lease period. Some of the fraudulent lease forms were signed by the agency employees who received delivery of the leased machines; other forms bore forged signatures. The bonding company argued that the forged documents were not covered under Insuring Agreement E "because the purported signor was not authorized to sign leases on behalf of the [state agency] lessees." Id. at 1029. The court disagreed. Applying proximate cause principles of Arkansas law, the court concluded that the loss "occurred directly from the fact that the Bank extended credit on the faith of the leases [which] contained forged signatures. Insuring Clause (E)(1)(i) requires no more." Id. at 1030.

In Alerus, the Minnesota District Court and Court of Appeals rejected Pine Bluff's expansive reading of the forgery coverage in Insuring Agreement E. See Alerus Fin. N.A., Dist. Ct. slip op. at 33; Alerus, 2012 WL 254484 at *5. The district court likewise declined to follow Pine Bluff. BancInsure, 2013 WL 5340887, at *7. As a federal court applying Minnesota law, we of course follow a persuasive opinion of the Minnesota Court of Appeals rather than a federal district court opinion applying Arkansas law. Moreover, while the broad reasoning in Pine Bluff seems at odds with the "majority rule" as adopted in Alerus, we are not at all convinced that the two decisions are inconsistent. In Pine Bluff, the underlying forged leases were subject to a contract defense if they were signed by a state employee lacking authority to do so. But they were not *worthless*, particularly if there was part performance, unlike the collateral provided by corporate guaranties and stock certificates of a sham company in Alerus. In these kinds of difficult, fact-intensive cases, it is important to distinguish between conflicting results and inconsistent judicial reasoning.

We likewise find unpersuasive Highland Bank's reliance on a case where the forged signature on the personal guaranty of the principal guarantor's spouse was held to establish coverage under Insuring Agreement E. Beach Cmty. Bank v. St. Paul Mercury Ins. Co., 635 F.3d 1190 (11th Cir. 2011). In Beach Community, the principal guarantor had assets of $130M and annual income of $2.6M when the loan was made,

but he was millions in debt when the borrower defaulted three years later. Id. at 1192-93. The Eleventh Circuit rejected the bonding company's reliance on decisions rejecting coverage "when banks rely on forged documents that describe collateral that does not exist." Id. at 1194. Because the guarantor spouses had substantial assets when the loan was made, the court reasoned, "the guaranty would have had value if it had been authentic." Id. at 1195. Here, the district court concluded that the Malone personal guaranty was worthless when delivered to FPC in May 2005, and when Highland Bank entered into the Collateral Assignments.

Seeking to bring its claim within the purview of Beach Community, Highland Bank argues that Malone's forged personal guaranty in fact did have value at the time it was issued because it was a separate promise to pay by a 50% owner of EAR whose joint personal financial statement reported substantial personal assets. The reported assets were in fact fictitious or worthless in May 2005, as FPC failed to discover, and the equipment reflected on the three subsequent Lease Schedules was overvalued, non-existent, and pledged to multiple lenders, as minimal investigation by Highland Bank would have discovered. But whether a personal guaranty was worthless is nonetheless a difficult issue, one that persuaded the divided Third Circuit panel in Jefferson Bank to reverse the grant of summary judgment and remand for a trial on this issue of proximate causation. 965 F.2d at 1285.

What distinguishes this case from Jefferson Bank, in our view, is the district court's recognition "that Highland Bank cannot show reliance on the Malone guaranty because it never obtained a legal interest in the guaranty." 2013 WL 5340887, at *8. It was FPC that obtained the personal guaranties of Player and Malone. Although Highland Bank examined copies of the guaranties before entering into Collateral Assignment agreements with FPC, Highland Bank relied on FPC's due diligence and warranties, taking an assignment of FPC's rights to the lease payments, and an assignment of FPC's interest in the leased equipment as collateral, but not an assignment of FPC's right to enforce the personal guaranties. Even after writing off

-12-

the unpaid lease payments, Highland Bank sought legal remedies from FPC and EAR's bankruptcy estate, but not from the personal guarantors. In these circumstances, we agree with the district court that the guaranties were worthless *at least to the Bank*. Therefore, Highland Bank failed to show the "direct relation between the injury asserted and the injurious conduct alleged" that the doctrine of proximate cause demands.

The judgment of the district court is affirmed.

_____