# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-2515

PRIVATE BANK &
TRUST COMPANY,

*Plaintiff-Appellant*,

v.

PROGRESSIVE CASUALTY
INSURANCE COMPANY,

*Defendant-Appellee.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 03 C 6031—**Amy J. St. Eve**, *Judge.*

———————

ARGUED DECEMBER 1, 2004—DECIDED MAY 27, 2005

———————

Before FLAUM, *Chief Judge*, and EVANS and SYKES, *Circuit Judges.*

SYKES, *Circuit, Judge.* This is an insurance coverage dispute arising from a fraud that caused a loss to the Private Bank & Trust Company. A man using a false identity, phony corporate documents, and stolen checks opened a corporate account at Private Bank's branch office in Wilmette, Illinois. Two days later, when the funds were cleared for use, he withdrew more than $400,000 from the account by telephone. The fraud was eventually discovered, and the

bank filed a claim with its insurer, Progressive Casualty Insurance Company. Progressive denied the claim, Private Bank sued, and the district court granted summary judgment in favor of the insurance company.

We affirm. The financial institution bond at issue in this case covers losses "resulting directly from theft, false pretenses . . . or . . . larceny committed by a person present in an office or on the premises of the Insured." The perpetrator of the fraud in this case was not present in the bank at the time he made the telephone withdrawal which caused the bank's loss. The bond's fraud coverage is expressly limited to losses that occur when the perpetrator of the fraud is present on the premises of the insured. We decline to adopt a rule of construction that would expand the bond's "on premises" fraud coverage to include losses from off-premises transactions that are preceded by on-premises fraudulent acts.

## I.  Background

On April 14, 2003, a man purporting to be "Lawrence Goodman" entered Private Bank's branch office in Wilmette and opened a corporate checking account. Representing himself as an employee of BBI Enterprises, Inc., "Goodman" presented an Illinois driver's license; articles of incorporation and an IRS Employer Identification Number for BBI Enterprises; and an employee identification card purportedly issued by BBI which, like the driver's license, showed "Goodman's" photograph. "Goodman" deposited two checks worth a total of $461,057.18 drawn on the account of Lear Corporation and made payable to "BBI Enterprises, Ltd." The Private Bank employee who opened the account for "Goodman" did not require his endorsement but instead endorsed both checks with a bank stamp.

Two days later, as soon as the deposited funds were cleared for use, "Goodman" purchased approximately 1,160

gold coins from a Chicago merchant who also owned an account at Private Bank. "Goodman" telephoned the bank and requested a transfer of $400,200 from the recently opened BBI account into the account of the gold dealer. Private Bank honored the telephonic request and the funds were transferred. Approximately two weeks later, Private Bank discovered that "Goodman" was actually one Robert A. Manola and the two checks he presented for deposit were stolen. The company Manola pretended to represent was a sham entity created for the purpose of stealing money from the real BBI Enterprises.

Apparently not satisfied with the proceeds of the fraudulent telephone transfer, Manola returned to the bank a few weeks later and attempted to withdraw the remaining money from the account. He was promptly arrested. However, Private Bank could not recover the funds it had transferred out of the account, so it filed a claim with Progressive under the "on premises" fraud coverage of its Financial Institution Bond. The "on premises" clause of the bond provides:

> The Underwriter . . . agrees to indemnify the Insured for:
>
>> (B)(1) Loss of Property resulting directly from . . .
>>
>>> (b) theft, false pretenses, common-law or statutory larceny, committed by a person present in an office or on the premises of the Insured while the Property is lodged or deposited within the offices or premises located anywhere.

Progressive denied the bank's claim and this lawsuit ensued. The parties filed cross-motions for summary judgment. The district court granted Progressive's motion, holding that the "on premises" fraud coverage of the insuring agreement required that the person causing the loss be physically present on the insured's premises when the loss occurs. The loss in this case occurred when Manola initiated the $400,200 telephone transfer while off the bank's

premises. Citing this court's decision in *Alpine State Bank v. Ohio Casualty Insurance Co.*, 941 F.2d 554 (7th Cir. 1991), the district court rejected the bank's argument that Manola's presence on the bank's premises at the time he opened the account was sufficient to trigger the bond's "on premises" fraud coverage. Because Manola was not present in the bank when he made the withdrawal that caused the bank's loss, the court concluded that the "on premises" fraud coverage did not apply.[1] Private Bank appeals.

## II. Discussion

The facts of this case are undisputed. We are presented with a question of insurance policy interpretation, which is a question of law that is reviewed de novo. *Alpine*, 941 F.2d at 559 (citing *First Nat'l Bank Co. v. Ins. Co. of N. Am.*, 606 F.2d 760, 768 (7th Cir. 1979)). Under Illinois law, which governs this case, "an insurance policy that contains no ambiguity is to be construed according to the plain and ordinary meaning of its terms, just as would any other contract." *Nat'l Fid. Life Ins. Co. v. Karaganis*, 811 F.2d 357, 361 (7th Cir. 1987); *U.S. Fire Ins. Co. v. Schnackenberg*, 429 N.E.2d 1203, 1205 (Ill. 1981). The precise question here is whether the "on premises" fraud coverage in a standard financial institution bond covers a loss that results from an off-premises fraudulent withdrawal that is preceded by fraudulent acts committed on the insured bank's premises.

The bond at issue in this case is a Financial Institution Bond Standard Form No. 24, the descendant of a series of

---

[1] The district court held in the alternative that even if the bond's "on premises" coverage applied, the "erroneous deposits" exclusion, contained in "exclusion (n)," precluded coverage. Because we affirm the district court's conclusion that the bond's "on premises" fraud coverage does not apply, we need not discuss the applicability of the exclusion.

bonds once known as "banker's blanket bonds." First marketed by Lloyd's of London in 1911, the blanket bond combines in a single instrument various types of unrelated coverage that were previously the subject of separate policies. *See* 9A JOHN ALAN APPELMAN & JEAN APPELMAN, INSURANCE LAW AND PRACTICE § 5701, at 375-76 (1981); Peter I. Broeman, *An Overview of the Financial Institution Bond, Standard Form No. 24*, 110 BANKING L.J. 439, 442-43 (1993). The first American banker's blanket bond, developed by the Surety Association of America in cooperation with the American Bankers Association in 1916, covered employee dishonesty, loss of property on premises or in transit through robbery or theft, as well as other risks. Broeman, *supra* at 443. The bond achieved its present general form in 1941 when Standard Form 24 appeared. *Id.* In 1986 the phrase "banker's blanket bond" was officially dropped in favor of the present name to discourage the erroneous belief that the contract covered any and all losses incurred by banks. *Id.* at 442. Although generalizations about the purpose of any insurance policy must always be evaluated in light of specific policy language, it has been said that the financial institution bond generally protects against risks of dishonesty, both internal and external, but does not cover losses caused by poor management or insure against risks inherent in banking operations. *See* APPELMAN, *supra*, § 5701, at 380.

The "on premises" insuring agreement is one of four basic insuring agreements in Private Bank's bond (additional coverage was purchased through optional insuring agreements and riders). Section (B)(1)(a) of the "on premises" agreement covers losses resulting directly from robbery, burglary, misplacement, and "mysterious unexplainable disappearances." Section (B)(1)(b), the section at issue here, covers losses "resulting directly from . . . theft, false pretenses, common-law or statutory larceny committed by a person present in an office or on the premises of the Insured."

Before 1980 the "on premises" requirement applied uniformly to losses now classified in both section (B)(1)(a) and section (B)(1)(b) of the bond, but in the revision undertaken in that year, false pretenses, theft, and larceny were split off from the other covered acts. Currently, while robbery, burglary, misplacement, and "mysterious unexplainable disappearances" continue to be covered if the act takes place while the *property* is on the insured's premises, coverage for losses resulting directly from theft, false pretenses, and larceny requires that the loss result from an act committed by a *person* present on the insured's premises. *See Oritani Sav. & Loan Ass'n v. Fid. & Deposit Co. of Md.*, 989 F.2d 635, 639 (3d Cir. 1993) (reproducing text of the pre-1980 "On Premises" insuring agreement).

Private Bank contends that its loss of $400,200 in connection with Manola's fraud qualifies as a loss resulting directly from false pretenses committed by a person "present on the premises" of the bank. No one disputes that Manola was on the bank's premises when he opened the checking account and deposited the stolen checks, but there is also no question that he was off the bank's premises when he withdrew most of the money, causing the loss. Private Bank argues that it was the fraudulent deposit, not the subsequent telephonic withdrawal, that "directly caused" the bank's loss.

This view, however, conflicts with this circuit's case law addressing "on premises" fraud coverage in similar bank frauds. *Alpine* involved a coverage dispute over bank losses stemming from a fraudulent scheme that resembled Manola's in relevant respects. In *Alpine* a bank customer misappropriated over $100,000 in checks drawn to the order of his employer. *Alpine*, 941 F.2d at 556. After endorsing the stolen checks with his employer's "for deposit only" stamp, the customer deposited the checks in his personal account at the bank. *Id.* He later withdrew some of the money in cash while on the bank's premises, but the amount disbursed

in that fashion was within the bond's $10,000 deductible; the question confronting the court was whether there was coverage for the bank's loss in excess of the $10,000 deductible.

The bank in *Alpine* argued, as Private Bank does here, that the loss occurred when the customer deposited the stolen funds. *Id.* at 561. We rejected this argument, relying on an earlier circuit precedent, *Bradley Bank v. Hartford Accident & Indemnity Co.*, 737 F.2d 657, 661 (7th Cir. 1984). *Bradley Bank* held that "[i]n no sense . . . did the mere act of accepting the deposits while [the bank's] customer was present irrevocably commit the [bank] to allow withdrawals from the account" even when "the bank's standard policy was to credit customer accounts immediately upon deposit." *Id.*; *see also Mitsui Mfrs. Bank v. Fed. Ins. Co.*, 795 F.2d 827, 832 (9th Cir. 1986) ("[A]ccepting deposited items and immediately crediting them to an account does not constitute constructive payment."). We concluded that absent a policy irrevocably committing the bank to allowing withdrawals at the moment of deposit, a loss occurs for purposes of the "on premises" fraud coverage in a financial institution bond only when the person who withdraws the money is physically present on the bank's premises at the time of the withdrawal. *Alpine*, 941 F.2d at 561; *see also Bradley Bank*, 737 F.2d at 661.

There is no evidence that Private Bank's operating policies irrevocably committed it to allowing "Goodman" to withdraw the money he deposited using the stolen checks. Nor has the bank identified any language in the bond that might, under the circumstances of this case, lead us to question the holdings or application of *Alpine* and *Bradley Bank*. We note that other circuits are in agreement with our interpretation of the bond's "on premises" coverage. *See Oritani*, 989 F.2d at 639 ("on premises" requirement unambiguously excludes coverage when loss is due to telephonic withdrawal); *Southern Nat'l Bank of N.C. v. United Pac.*

*Ins. Co.*, 864 F.2d 329, 333 (4th Cir. 1989) (" 'on premises' language is designed to limit coverage to losses sustained because of the fraudulent act of a person *physically* present at the bank"); *Mitsui*, 795 F.2d at 831 ("on premises" coverage requires that "the depositor or his representative be on the premises at the time of 'payment' or 'withdrawal' ").

Nothing in the language of the "on premises" clause suggests that coverage is extended for losses that occur through telephonic banking. Indeed, "[c]ommentators, including those in the banking industry, have emphasized that the 'on premises' requirement in standard blanket bonds is designed to exclude coverage for losses from fraud perpetrated by telephone or computer, except in those rare instances where the perpetrator phones or uses a computer hook-up from the property of the bank itself or from the property of a custodian entrusted by the bank to safeguard the funds." *Southern Nat'l Bank*, 864 F. 2d at 332, (citing AMERICAN BANKER'S ASSOCIATION, DIGEST OF BANK INSURANCE § 1.3.12 (4th ed. 1981 & Supp. 1984); *see also* J. Kelly Reyher, *A Brief Review of the Financial Institution Bond Standard Form No. 24 and Commercial Crime Policy*, 563 PLI/LIT. 57, 67 (1997).

Private Bank urges us to treat its loss as the result of a single fraudulent scheme, the crucial components of which occurred on the bank's premises. The bank concedes that it would not have suffered a loss but for Manola's telephonic withdrawal. It argues, however, that no loss would have occurred if Manola had not opened the checking account or deposited the stolen checks in the first place. Private Bank thus asks us to adopt a rule of construction whereby losses are covered under the "on premises" insuring agreement if the "principal" fraudulent acts or "most" of the fraudulent scheme occurs on the bank's premises.

We decline to gloss the bond's language in this way. Any such rule of construction would be difficult to articulate, much less apply. Would the rule focus on the sheer number

of constituent acts leading up to the loss or the relative significance of the acts? How much of the fraudulent scheme would have to occur "on premises" in order to bring a loss from an off-premises transaction within the bond's "on-premises" coverage? How would the significance of the acts be evaluated under a "quality" over "quantity" approach? *Alpine* and *Bradley Bank* already evaluate the bond's "on premises" coverage in light of bank policy; if the bank irrevocably commits itself to permitting withdrawals as soon as deposits are received, then the loss can be said to occur at the time of deposit, triggering coverage for a subsequent off-premises transaction (assuming no other policy exclusions apply). But we see no reason to broaden this caveat into an across-the-board rule that "on premises" coverage for losses from off-premises fraudulent transactions is to be determined on a case-by-case basis in light of the totality of circumstances preceding the loss.

Because the perpetrator of the fraud against Private Bank was not on the premises of the bank at the time he made the telephonic withdrawal that caused the bank's loss, the "on premises" coverage of the financial institution bond does not apply. The district court properly granted summary judgment to Progressive.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*