In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 06-3685 & 06-3794

FIRST STATE BANK OF MONTICELLO,

*Plaintiff-Appellee,*
*Cross-Appellant,*

*v.*

OHIO CASUALTY INSURANCE COMPANY,

*Defendant-Appellant,*
*Cross-Appellee.*

Appeals from the United States District Court
for the Central District of Illinois.
No. 04 C 2089—**Harold A. Baker**, *Judge.*

ARGUED JANUARY 9, 2008—DECIDED FEBRUARY 5, 2009

Before WOOD, SYKES, and TINDER, *Circuit Judges.*

SYKES, *Circuit Judge.* This insurance-coverage dispute arises from a fraudulent scheme perpetrated against First State Bank of Monticello causing a $307,000 loss. James Stilwell repeatedly exchanged bad checks for the bank's

money orders—instruments backed by the resources of the bank and as good as cash. The bank filed a claim for the loss with its insurer, Ohio Casualty Insurance Company, under a Standard Form No. 24 Financial Institution Bond. Ohio Casualty denied the claim and this lawsuit followed. The district court held the loss was covered and granted summary judgment in favor of First State Bank. Ohio Casualty appealed; the bank cross-appealed on the issue of its entitlement to prejudgment interest.

We affirm. Stilwell's scheme was a covered risk under Insuring Agreement B of the bond, which covers losses from theft or false pretenses occurring on the bank's premises. The bank's loss resulted "directly from" Stilwell's "on-premises" fraud and therefore came within the coverage specified in this provision of the bond. We also conclude that Exclusion (h), excluding losses "caused by an employee," does not apply. Finally, the bank's tardy application for statutory prejudgment interest, first made in the district court in a motion to alter or amend the judgment under Rule 59(e) of the *Federal Rules of Civil Procedure*, was brought too late to entitle it to an award.

## I. Background

For several months in 2002 and 2003, James Stilwell of Atwood, Illinois, carried on an extensive scheme of writing and cashing worthless checks. First State Bank in nearby Monticello was his victim. Stilwell was a prominent entrepreneur who owned several businesses and some development property in central Illinois, but he was also

illiquid.[1] To acquire cash, Stilwell devised a scheme whereby he (or more commonly, one of his associates) would draw checks on one of his accounts at Tuscola National Bank and tender them to First State Bank in return for bank money orders, instruments backed by the resources of First State Bank. But Stilwell's account at Tuscola National Bank was empty, or less than empty; Tuscola National Bank allowed him to maintain negative balances for months at a time, returning some items and paying others that Stilwell directed to be paid when he put funds into the account after the fact. So First State Bank unwittingly allowed Stilwell to exchange his worthless checks for the bank's money orders, giving him access to immediately available funds. Stilwell carried out this scheme for three months at the end of 2002 and into early 2003, tendering checks daily to First State Bank through January 24, 2003. Over that time First State Bank "sold" Stilwell 130 bank money orders for a total of $1,945,672.16.

Cashing checks for noncustomers was against the bank's policy (Stilwell had no accounts at First State Bank), but when bank officers questioned Stilwell about the transactions, he concocted a cover story that he was conducting a year-end tax maneuver recommended by his accountant to reduce his tax liability on a future sale of land. On one occasion, to quell the doubts of a bank

---

[1] James Stilwell's financial activities are at issue in another insurance-law case decided today. *See Stilwell v. Am. Gen. Life Ins. Co.*, Nos. 07-2613 & 07-2684.

officer, Stilwell dialed Tuscola National Bank's automated banking system and handed the officer the phone, allowing her to listen to a statement of the current balance in his—or what he claimed was his—account. So while some at First State Bank expressed concerns, others believed him, and the bank continued to accept his business based on his facade of being a successful businessman. The scheme collapsed on January 24, 2003, when Tuscola National Bank froze Stilwell's accounts. First State Bank was left holding worthless checks totaling $307,000 from the last three days of the scheme.

First State Bank and Stilwell entered into an agreement requiring Stilwell to repay the bank in a series of installments and to admit that he had engaged in unlawful conduct. But Stilwell died before fulfilling the terms of that agreement. First State Bank filed a claim with its insurer, Ohio Casualty, after one of Stilwell's corporations filed for bankruptcy, preventing the bank from recovering its loss from the corporation. Ohio Casualty denied the bank's claim, asserting that Stilwell's scheme was not covered under the bond's "on-premises" fraud coverage (Insuring Agreement B of the Standard Form No. 24 Financial Institution Bond) or was excluded because it fell under Exclusion (h) of the bond, which excluded losses "caused by an employee."

First State Bank then brought this lawsuit in state court, which Ohio Casualty removed to federal court based on the parties' diverse citizenship. On cross-motions for summary judgment, Ohio Casualty asserted several grounds for noncoverage. It claimed that the bank did not

suffer a "loss" as that term is understood in the bond; or if there was a loss, it did not "result directly from" Stilwell's conduct; or if the loss was attributable to Stilwell's scheme, the failure of the bank's employees to follow bank policy was an intervening and the predominant cause of the loss, removing coverage under Exclusion (h) of the bond for losses "caused by an employee." The district court rejected these arguments, granted First State Bank's motion, and awarded judgment to the bank. First State Bank then moved to alter or amend the judgment under Rule 59(e), asking the court to clarify the amount of the award and to add statutory prejudgment interest. The district court agreed to clarify the award amount in the judgment ($292,000—the amount of the loss less the deductible), but denied First State Bank's request to add prejudgment interest to the award. Ohio Casualty appealed the summary judgment, and First State Bank cross-appealed the denial of its Rule 59(e) motion for prejudgment interest.

## II.  Discussion

We review the district court's grant of summary judgment de novo, and because the district court had cross-motions for summary judgment before it, "we construe all facts and inferences therefrom 'in favor of the party against whom the motion under consideration is made.'" *United Air Lines, Inc. v. HSBC Bank, USA (In re United Air Lines, Inc.)*, 453 F.3d 463, 468 (7th Cir. 2006) (quoting *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 536 (7th Cir. 2004)). Summary judgment is appropriate if "there is no genuine issue as to any material

fact and . . . the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Illinois law, the parties agree, governs this case.

We review the interpretation of a fidelity bond de novo. *Private Bank & Trust Co. v. Progressive Cas. Ins. Co.*, 409 F.3d 814, 816 (7th Cir. 2005) (Illinois law). A bond "that contains no ambiguity is to be construed according to the plain and ordinary meaning of its terms, just as would any other contract." *Id.* (internal quotation marks omitted); *see also RBC Mortgage Co. v. Nat'l Union Fire Ins. Co.*, 812 N.E.2d 728, 734 (Ill. App. Ct. 2004). Standard fidelity bonds are drafted by sophisticated parties (representatives of the banking and insurance industries); therefore, the traditional rule of construing any ambiguity in favor of coverage does not apply. *First Nat'l Bank of Manitowoc v. Cincinnati Ins. Co.*, 485 F.3d 971, 977 (7th Cir. 2007); *RBC Mortgage Co.*, 812 N.E.2d at 734. The bond that Ohio Casualty sold to First State Bank was a standard financial-institution bond that contained an "on-premises" clause generally covering fraudulent acts occurring on the bank's physical premises.

The standard financial-institution bond is a unique insurance instrument with a long and detailed history. Some of it bears repeating here because part of what makes the bond unique is that nearly every provision "has been developed in response to and tested by case law." J. Kelly Reyher, *A Brief Review of the Financial Institution Bond Standard Form No. 24 and Commercial Crime Policy*, 563 PLI/Lit 57, PLI Order No. H4-5259, 61 (May 1997). The Standard Form No. 24 Financial Institution

Bond is the latest incarnation of a series of bonds once known as "banker's blanket bonds." *First Nat'l Bank of Manitowoc,* 485 F.3d at 977-78; *see also* 9A JOHN ALAN APPELMAN & JEAN APPELMAN, INSURANCE LAW AND PRACTICE § 5701, at 375-76 (1981); Peter I. Broeman, *An Overview of the Financial Institution Bond, Standard Form No. 24*, 110 BANKING L.J. 439, 442-43 (1993). These bonds were first developed in response to the uniform contract marketed by Lloyd's of London, which was the only contract to provide fidelity, theft, burglary, holdup, and other types of coverage in one contract. *See Private Bank,* 409 F.3d at 816. The Surety Association of America and the American Bankers Association worked together in 1916 to draft their first bond, the Standard Form No. 1 Banker's Blanket Bond, to compete with the uniform contract offered by Lloyd's. *Id.; see also* Edward G. Gallagher et al., *A Brief History of the Financial Institution Bond, in* FINANCIAL INSTITUTION BONDS 7 (2d ed. Duncan L. Clore ed., 1998). Today, Standard Form No. 24 is the descendant of that first bond, containing six Insuring Agreements (Agreements A-F). In this case, we are concerned with Insuring Agreement B of the Standard Form No. 24 (1986 Revision) that Ohio Casualty sold to First State Bank.[2] Agreement B is the "on-premises" fraud clause of the bond. Its relevant portion provides as follows:

---

[2] Because the standard bond is sometimes modified by the parties and various iterations of it are in use, it is important to determine which version of the bond is under consideration. Caselaw interpreting other versions may be unhelpful or irrelevant to a court's interpretation of the bond. *See First Nat'l Bank of Manitowoc*, 485 F.3d at 977.

> The Underwriter . . . agrees to indemnify the Insured for:
>
> > (B)(1) Loss of Property resulting directly from . . .
> >
> > > (b) theft, false pretenses, common-law or statutory larceny, committed by a person present in an office or on the premises of the Insured while the property is lodged or deposited within offices or premises located anywhere.

Ohio Casualty does not dispute that Stilwell's fraudulent conduct (or that of his associates) was committed on the bank's premises. It argues that First State Bank did not incur a "loss . . . resulting directly from . . . false pretenses."

The first part of Ohio Casualty's argument is that First State Bank did not, in fact, suffer a loss because it received a valid and enforceable instrument—namely, Stilwell's check drawn on his (empty) account at Tuscola National Bank—in exchange for its money order. If First State Bank incurred any loss, Ohio Casualty argues that it would have occurred later when First State Bank was unable to collect on Stilwell's check. That, Ohio Casualty asserts, would not have been a covered loss because *that* event would neither have taken place on First State Bank's premises nor "resulted directly from" any false pretenses.

Under Illinois law, and in most jurisdictions, a loss is an "actual depletion of bank funds"; bookkeeping or theoretical losses are not covered by the financial-institution bond. *RBC Mortgage Co.*, 812 N.E.2d at 733; *see also Reserve Ins. Co. v. Gen. Ins. Co. of Am.*, 395 N.E.2d 933, 939 (Ill. App. Ct. 1979); *Private Bank*, 409 F.3d at 817 (Illinois

law); *Cincinnati Ins. Co. v. Star Fin. Bank*, 35 F.3d 1186, 1191 (7th Cir. 1994) (Indiana law) (requiring an actual loss instead of merely a bookkeeping or theoretical loss); *FDIC v. United Pac. Ins. Co.*, 20 F.3d 1070, 1080 (10th Cir. 1994) (federal law) (the bond does not cover "[b]ookkeeping or theoretical losses, not accompanied by actual withdrawals of cash or other such pecuniary loss"); William T. Bogaert & Andrew F. Caplan, *Loss and Causation Under the Financial Institution Bond*, *in* FINANCIAL INSTITUTION BONDS, *supra*, at 385-87. First State Bank's loss was such an "actual loss."

It is true that First State Bank did not experience a loss at the precise moment Stilwell exchanged his checks for the bank's money orders; although his account was empty, it was not *certain* that the checks would be returned unpaid, as evidenced by the fact that Tuscola National Bank had paid some of Stilwell's earlier checks despite the negative balance in his account. At the moment of the exchange, any loss from acquiring Stilwell's checks was merely theoretical. But First State Bank experienced an actual loss when Tuscola National Bank refused to honor Stilwell's checks. Once it did so, First State Bank necessarily had fewer available assets. That the act of nonpayment occurred "off premises" is of no moment. Insuring Agreement B requires only that the *false pretenses* be committed by a person on First State Bank's premises, and that's exactly what happened here. (We will defer for a moment the question of whether the bank's loss resulted "directly from" Stilwell's on-premises fraud.)

Ohio Casualty also makes a weak argument that Stilwell's conduct did not amount to false pretenses.

Illinois law considers the term "false pretenses" in the financial-institution bond to include, at the least, deceptive practices under the Illinois criminal statutes. *First Nat'l Bank of Decatur v. Ins. Co. of N. Am.*, 424 F.2d 312, 317 (7th Cir. 1970) (citing what is now 720 ILL. COMP. STAT. 5/17-1 (2006)). Section 5/17-1(B)(d) of the Illinois Statutes makes it a crime for an individual to "issue[] or deliver[] a check . . . knowing that it will not be paid by the depository. Failure to have sufficient funds . . . is prima facie evidence that the offender knows that it will not be paid by the depository, and that he or she has the intent to defraud." As we have noted, Stilwell knew that he did not have any funds at Tuscola National Bank on the dates in question. All along, he concocted and maintained an elaborate cover story to effectuate his scheme, and there is no evidence in the record to overcome the statutory presumption that Stilwell intended to defraud. That he occasionally put money in his account at Tuscola National Bank to cover some of his earlier bad checks after the fact does not negate his intent to defraud. His willingness to sign an installment repayment agreement after his deception was uncovered is irrelevant.

We now return to Ohio Casualty's argument that First State Bank's loss did not result "directly from" Stilwell's false pretenses. This language in the financial-institution bond has undergone a series of revisions. Earlier versions of the bond required merely a "loss through" a covered event or transaction. Bradford R. Carver, *Loss and Causation*, *in* HANDLING FIDELITY BOND CLAIMS 363, 379 (2d ed. Michael Keeley & Sean Duffy eds., 2005). The 1986 version of the bond specifically modified the bond to

require, in the case of some coverages, a loss "resulting directly from" the covered peril. This was a response to certain court interpretations that applied tort concepts of causation to the bond's loss-causation requirements. *Id.*

Indeed, loss causation has been a sometimes-misunderstood concept in the caselaw interpreting financial-institution bonds. Even after the 1986 revision, some courts have continued to look to proximate cause and other causation principles borrowed from tort law to decide loss-causation issues under the financial-institution bond. *See, e.g., Resolution Trust Corp. v. Fid. & Deposit Co. of Md.,* 205 F.3d 615, 655 (3d Cir. 2000); *Empire Bank v. Fid. & Deposit Co.,* 828 F. Supp. 675, 679, *aff'd* 27 F.3d 333 (8th Cir. 1994); *Jefferson Bank v. Progressive Cas. Ins. Co.,* 965 F.2d 1274, 1282 (3d Cir. 1992); *First Nat'l Bank of Louisville v. Lustig,* 961 F.2d 1162, 1167-68 (5th Cir. 1992), *amended by,* No. 90-3820, 1992 U.S. App. LEXIS 14873 (5th Cir. June 29, 1992); *Hanson PLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 794 P.2d 66, 73 (Wash. Ct. App. 1990). This approach is misdirected; tort-causation concepts like proximate cause, "substantial factor" causation, and intervening cause are inappropriate here. In particular, the concept of proximate cause is problematic in this context; proximate cause is a shifting standard that draws the line of causation "because of convenience, of public policy, of a rough sense of justice . . . . It is practical politics." *Palsgraf v. Long Island R.R.,* 162 N.E. 99, 103 (N.Y. 1928) (Andrews, J., dissenting). Insurance-coverage cases are not concerned with the philosophical social-duty underpinnings of tort law. The action sounds in contract, and our task is to

interpret the parties' agreement. Justice (then Judge) Cardozo explained the inapplicability of tort-causation principles in this context nearly a century ago:

> General definitions of a proximate cause give little aid. Our guide is the reasonable expectation and purpose of the ordinary business man when making an ordinary business contract. It is his intention, expressed or fairly to be inferred, that counts. There are times when the law permits us to go far back in tracing events to causes. The inquiry for us is how far the parties to this contract intended us to go. . . .
>
> The question is not what men ought to think of as a cause. The question is what they do think of as a cause.

*Bird v. St. Paul Fire & Marine Ins. Co.*, 120 N.E. 86, 87 (N.Y. 1918).

Accordingly, contract—not tort—principles apply to the determination of loss causation; Illinois follows this rule. *See RBC Mortgage Co.*, 812 N.E.2d at 733-36 (rejecting proximate-cause analysis of loss causation in financial-institution bond context); *Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 138 F. Supp. 2d 1088, 1100-01 (N.D. Ill. 2001) (Illinois law); *see also* Bradford R. Carver, *Loss and Causation*, *supra*, at 380; Maura Z. Pelleteri, *Causation in Loan Loss Cases*, *in* LOAN LOSS COVERAGE UNDER FINANCIAL INSTITUTION BONDS 258 (Gilbert J. Schroeder & John J. Tomaine eds., 2007). Insuring Agreement B's coverage of losses resulting "directly from" on-premises false pretenses means what it says. The bond's "direct loss" requirement "must be afforded its plain and ordinary

meaning; 'direct' means 'direct.' " *RBC Mortgage Co.*, 812 N.E.2d at 736-37 (citation omitted).

We have already noted that the bank's assets were depleted as a result of Stilwell's fraudulent money-order transactions at the bank on January 22, 23, and 24, 2003. The bank disbursed immediately available funds to Stilwell; Stilwell's account at Tuscola National Bank was frozen and, in any event, empty; and the checks were returned unpaid. This suffices to satisfy a common and ordinary understanding of a loss resulting directly from a fraud occurring on the bank's premises. The slight gap in time between the money-order transactions and the nonpayment of the checks makes no difference; the loss flowed directly from Stilwell's on-premises fraud.

Ohio Casualty's arguments about intervening or contributing causes—such as Stilwell's death, his corporation's bankruptcy, and the bank officers' failure to follow bank policy—do not make the bank's loss from Stilwell's false pretenses any less direct. We have already explained that tort concepts like contribution and intervening cause do not apply. Those events or omissions, standing alone or in combination, did not cause the bank's loss in the sense meant by the bond; nor do they operate to make Stilwell's on-premises fraud merely an "indirect" cause of the bank's loss. What is important is that without Stilwell's on-premises misconduct—without the false pretenses under which he tendered his checks—First State Bank would not have suffered a loss. First State Bank's loss thus resulted "directly from" Stilwell's on-premises false pretenses, and there is coverage under Insuring Agreement B.

All that remains is Ohio Casualty's argument that Exclusion (h) operates to exclude coverage. Exclusion (h) is contained in Section 2 of the bond and applies to all six Insuring Agreements. It excludes:

> (h) loss caused by an Employee, except when covered under Insuring Agreement (A) or when covered under Insuring Agreement (B) or (C) and resulting directly from misplacement, mysterious unexplainable disappearance or destruction of or damage to Property . . . .

Ohio Casualty argues that First State Bank's loss was actually caused by its employees' failure to follow bank policy in accepting Stilwell's checks and therefore falls within Exclusion (h). This argument is based on an overbroad reading of the exclusion. Stilwell's on-premises fraud was the actual and direct cause of the bank's loss; the bank employees' *failure to prevent* the loss does not trigger Exclusion (h). Ohio Casualty's expansive interpretation of Exclusion (h) would swallow all—or nearly all—of the bond's coverages because a bank must necessarily operate through its employees. *See First Nat'l Bank of Manitowoc*, 485 F.3d at 980-81. Indeed, if the exclusion were applicable under the circumstances present here, there might never be coverage for any on-premises fraudulent transaction because all such transactions are handled—at one level or another—by a bank employee. *See id.* If we were to accept Ohio Casualty's interpretation of Exclusion (h), we would eviscerate much of the coverage granted under the bond. *Id.*

On this point, Ohio Casualty relies most heavily on the Eighth Circuit's decision in *Empire Bank*, 27 F.3d at 335, but

we reject the analogy. As we have noted, *Empire Bank* imported a proximate-cause analysis from tort law, which is inconsistent with Illinois law and the general rule in this context. The case is also distinguishable. Empire Bank's employees *knew* that two customers were engaged in a fraud; in fact, one supervisor aided in the commission of that fraud. But the bank employees in this case were unaware that Stilwell's checks were written against an account with a negative balance. Stilwell's fraud, not the bank employees' failure to investigate, caused First State Bank's loss in the sense meant by the bond; Exclusion (h) does not apply.[3]

We need only briefly address First State Bank's argument that it was entitled to statutory prejudgment interest. *See* 815 ILL. COMP. STAT. 205/2 (2006). The bank first requested prejudgment interest in a motion to alter or amend the judgment under Rule 59(e), having failed to raise the issue in its earlier motion for summary judgment. An award of prejudgment interest may be within the scope of Rule 59(e), *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175-78 (1989); *Employers Ins. of Wausau v. Titan Int'l, Inc.*, 400 F.3d 486, 488 (7th Cir. 2005), but the rule may not be used

---

[3] Ohio Casualty also cites *Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Insurance Co.*, 472 F.3d 33, 48-49 (2d Cir. 2006), applying New York law and a so-called "efficient cause" rule. Illinois has no similar rule in this context, and given its rejection of proximate cause and other tort-causation principles in the interpretation of fidelity bonds, *see RBC Mortgage Co.*, 812 N.E.2d at 733-36, we doubt it would adopt the *Parks Real Estate* approach.

by "a party to complete presenting his case" to the district court. *In re Reese*, 91 F.3d 37, 39 (7th Cir. 1996) (internal quotation marks omitted); *see also Uphoff v. Elegant Bath, Ltd.*, 176 F.3d 399, 409-10 (7th Cir. 1999). " '[P]rejudgment interest, unlike post-judgment interest, normally is considered an element of the judgment itself, that is, of the relief on the merits . . . .' " *Uphoff,* 176 F.3d at 410 (quoting *Healy Co. v. Milwaukee Metro. Sewerage*, 60 F.3d 305, 308 (7th Cir. 1995)). So while we have no quarrel with First State Bank's contention that prejudgment interest *may* be a proper subject for a Rule 59(e) motion, "so long as the requirements of Rule 59(e) have been complied with," the bank "should have requested the prejudgment interest *prior* to judgment." *Id.* The district court was entitled to conclude that raising the issue of prejudgment interest for the first time in a Rule 59(e) motion, after summary judgment was entered, was too late.

AFFIRMED.