[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-11049

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 16, 2011
JOHN LEY
CLERK

D.C. Docket No. 5:09-cv-00106-RS-MD

BEACH COMMUNITY BANK,

Plaintiff - Appellant,

versus

ST. PAUL MERCURY INSURANCE COMPANY,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(March 16, 2011)

Before WILSON, PRYOR and ANDERSON, Circuit Judges.

PRYOR, Circuit Judge:

This appeal concerns whether the provision of a financial institution bond that insures a bank against losses from forgery applies to a loss suffered by a bank

upon the default of a loan that had been secured by a forged guaranty. The bank obtained the guaranty to secure property held in a tenancy by the entirety. Beach Community Bank appeals the summary judgment in favor of St. Paul Mercury Insurance Company against a complaint that alleged that St. Paul failed to honor a financial institution bond it had issued to Beach Community that covered "loss[es] resulting directly from the . . . exten[sion of] credit . . . on the faith" of a forgery. Beach Community secured a loan to Dellwood Properties, Inc., with guaranties from the owner of Dellwood, Charles Faircloth, and Charles's wife, Juanita Faircloth, but after Charles died and Dellwood defaulted on the loan, Beach Community learned that Juanita's signature on the guaranty was a forgery. Beach Community sued St. Paul to recover under the bond and alleged that it had suffered a loss directly from reliance on the forged guaranty. The district court ruled that the loss did not result directly from reliance on the forgery because the purported guarantor had few assets when the default occurred, and Beach Community could not have recovered its loss even if the guaranty had been authentic. St. Paul argues that we should affirm for that reason or, alternatively, on three separate grounds: Beach Community did not rely on the forgery, did not act in good faith, and did not have physical possession of the forgery when it extended credit. We conclude that the district court misinterpreted the bond and

2

that Beach Community suffered a loss that resulted directly from its extension of credit to Dellwood. We also conclude that the record does not entitle St. Paul to a summary judgment in its favor on any of its three alternative grounds. We vacate and remand.

## I. BACKGROUND

In August 2004, Dellwood Properties, Inc., applied for a loan of $10 million from Beach Community Bank to finance the purchase of beachfront property in Panama City Beach, Florida. Dellwood was a Florida corporation, and its sole officer, director, and shareholder was Charles Faircloth, a 75-year-old developer. When it assessed the risk of the proposed loan, Beach Community examined the tax returns that Charles filed jointly with his wife, Juanita Faircloth, conducted a credit analysis of Charles, and obtained credit reports for both Charles and Juanita, but submitted only Charles's credit report to its loan committee. Beach Community determined that Charles had a net worth of over $130 million, an average annual income of $2.6 million, and no direct liabilities.

The loan committee approved the loan to Dellwood on September 2, 2004, conditioned on the receipt of guaranties from Charles and Juanita. Beach Community had presumed that Charles shared ownership of many of his assets with Juanita. Florida recognizes tenancies by the entirety, and a representative of

3

Beach Community testified that Beach Community conditioned the loan on the receipt of personal guaranties from both Charles and Juanita because "it [is] very easy for [an owner of property held in a tenancy by the entirety] to transfer . . . assets over to the spouse or just make them joint, and then they're impossible for [a lender] to get." Another officer of Beach Community stated that "[Beach Community] would not have extended credit to Dellwood in the absence of [Juanita's] personal guaranty." Even though the credit analysis that the loan committee examined provided that "Charles Faircloth will offer his unconditional personal guarantee," the "Loan Worksheet/Credit Approval" form that the loan committee also used said that "Mr. & Mrs. Charles Faircloth" would guarantee the loan.

On September 10, 2004, Beach Community and Dellwood closed the loan. Beach Community hired a lawyer to prepare its documents, but the lawyer did not attend the closing. Charles's business associate, Derrick Bennett, instead closed the loan. Even though he was not employed by Beach Community, Bennett testified that he was obligated at the closing to "have signatures obtained [for the guaranties] and/or placed on the documents, collect them up, and send them back [to Beach Community] just like all the other documents [Beach Community] provide[s] me." Bennett was not responsible for verifying the authenticity of

4

signatures on documents.

Juanita did not attend the closing, but Charles handed Bennett a personal guaranty at the closing that purportedly bore Juanita's signature. The guaranty provided, "I absolutely and unconditionally guarantee to you the payment and performance of each and every debt, of every type and description, that the borrower may now or at any time in the future owe you." The guaranty was not witnessed or signed by a notary public. Bennett notified Beach Community when he received the guaranty, and Beach Community then gave Bennett permission to disburse funds to Dellwood. Three days after the closing, Beach Community received from Bennett the guaranty purportedly signed by Juanita.

Beach Community later purchased from St. Paul Mercury Insurance Company a financial institution bond, also known as a bankers blanket bond, which insured Beach Community against several risks, including losses due to "forgery and alteration of securities and other instruments." St. Paul agreed to indemnify Beach Community for "[l]oss resulting directly from [Beach Community] having, in good faith . . . extended credit . . . on the faith of any original Written document," including a guaranty, "which bears a handwritten signature . . . that is a Forgery." The bond also provided that "[a]ctual physical possession of the [forged document] by the Insured is a condition precedent to the

5

Insured's having relied on the faith of such items." Beach Community obtained loan participation coverage under the bond, which allowed Beach Community to satisfy the requirement of "[a]ctual physical possession" when a "representative authorized to possess [documents such as guaranties]" possessed the documents "on behalf of [Beach Community]." The bond insured losses caused by forgery for up to $4 million and had a deductible of $50,000. The bond "applie[d] to loss discovered by the Insured during the Bond Period[] . . . regardless of when the act or acts causing or contributing to such loss occurred."

Beach Community discovered a loss soon after it purchased the bond. Charles died in 2007. Even though he had assets of $130 million in 2004, Charles left an estate three years later that had less than $100,000 in cash and several million dollars in debt. Dellwood defaulted on the loan from Beach Community the month after Charles died.

Beach Community accelerated the full debt, sued Dellwood, and obtained a judgment for $11,798,725.05. Beach Community collected about $950,000 of this amount from debtors of Dellwood. Beach Community then sought to collect the outstanding balance of the debt from Juanita, but these efforts were futile. Juanita had few assets, namely a homestead, income from Social Security, and income of $2,000 each month from a mortgage. Juanita owned a condominium unit in 2008

6

that was not a homestead, but she later sold that property.

Juanita denied that she had signed the guaranty, and a handwriting expert confirmed that the signature on the guaranty that she had purportedly signed was a forgery. Beach Community notified St. Paul of its loss and sought coverage under the forgery provision of the bond.

St. Paul refused coverage, and Beach Community filed a lawsuit against St. Paul in state court for breach of contract, which St. Paul removed to the district court. Both St. Paul and Beach Community moved for summary judgment. St. Paul argued that Beach Community had failed to satisfy the requirements for coverage under the bond. St. Paul alleged that Beach Community did not rely on Juanita's guaranty and had requested it to reach only Charles's assets. St. Paul also argued that Beach Community did not physically possess the guaranty when it extended credit, did not make the loan in good faith, and did not suffer a loss that was directly caused by the forgery because Juanita had no assets from which Beach Community could have collected even if the signature on the guaranty had been authentic.

The district court granted summary judgment in favor of St. Paul on the ground that Beach Community failed to demonstrate that its loss "result[ed] directly from the forged guarantee." The district court ruled that Beach

7

Community had to "show that it would have been able to collect on the loan but for the forged signature of Mrs. Faircloth's guarantee." The district court reasoned that "it was not the forged guarantee that precluded [Beach Community] from collecting on the loan, but rather Mr. and Mrs. Faircloth's diminished assets and the crashed real estate market that caused [Beach Community's] loss." Quoting from our decision in Republic National Bank v. Fidelity & Deposit Co. of Maryland, 894 F.2d 1255, 1264 (11th Cir. 1990), the district court expressed concern that a ruling in favor of Beach Community would transform the bond into credit insurance and encourage "sloppy banking practices" and "fraud against the insurer." The district court did not rule on the other grounds that St. Paul raised in its motion for summary judgment, but observed in a footnote that the failure of Beach Community to "require proof that Mrs. Faircloth's signature was genuine makes it difficult to find that [Beach Community] truly 'relied' on Mrs. Faircloth's guarantee in funding the loan."

## II. STANDARD OF REVIEW

"We review de novo a summary judgment." Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC, 555 F.3d 1331, 1337 (11th Cir. 2009). "Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

8

material fact and that the movant is entitled to judgment as a matter of law." Jean-Baptiste v. Gutierrez, 627 F.3d 816, 820 (11th Cir. 2010).

## III. DISCUSSION

We divide our discussion in two parts. First, we address whether Beach Community suffered a loss that "result[ed] directly from" its extension of credit. Second, we address and reject the three arguments St. Paul presents as alternative grounds to affirm.

### A. St. Paul Fails to Establish That the Loss of Beach Community Did Not Result Directly from the Extension of Credit.

Beach Community argues that the district court misconstrued the financial institution bond St. Paul issued to Beach Community, which provided coverage for "[l]oss resulting directly from" the extension of credit "on the faith of" a forgery. St. Paul argues we should affirm because "[a]n authentic guarantee from Mrs. Faircloth would not have allowed Beach [Community] to reach Mr. Faircloth's assets," nor would an authentic guaranty have "allowed Beach [Community] to collect the outstanding debt from Mrs. Faircloth" because she had few assets at the time of Dellwood's default. St. Paul cites in support of its argument decisions of other courts that have held that losses do not directly result from the extension of credit when banks rely on forged documents that describe

9

collateral that does not exist.  We agree with Beach Community.

Two matters inform our interpretation of the bond.  First, Florida law governs our interpretation of the bond.  Erie R.R. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 822 (1938).  "Under Florida law, insurance contracts are construed according to their plain meaning."  Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co., 913 So. 2d 528, 532 (Fla. 2005).  Second, because the bond contains language standard in financial institution bonds issued to American banks, the interpretation of that standard language by courts in other jurisdictions is persuasive in our resolution of this appeal.  "The standard financial-institution bond is a unique insurance instrument with a long and detailed history."  First State Bank of Monticello v. Ohio Cas. Ins. Co., 555 F.3d 564, 568 (7th Cir. 2009).  "[P]art of what makes the bond unique is that nearly every provision 'has been developed in response to and tested by case law.'"  Id. (quoting J. Kelly Reyher, A Brief Review of the Financial Institution Bond Standard Form No. 24 and Commercial Crime Policy, 563 PLI/Lit 57, 61 (1997)).

The "resulting directly" language in the bond was adopted in response to the erroneous application of tort concepts of causation by some courts to earlier versions of the bond.  See id. at 570.  "[T]ort-causation concepts like proximate cause, 'substantial factor' causation, and intervening cause are inappropriate" for

10

interpreting a financial institution bond, which is instead governed by contract law. Id.; see also Prudential Prop. & Cas. Ins. Co. v. Swindal, 622 So. 2d 467, 470 (Fla. 1993) ("Florida law has long followed the general rule that tort law principles do not control judicial construction of insurance contracts."). In its only decision that interpreted the phrase "resulting directly" in an insurance policy, the Supreme Court of Florida refused to apply a test of proximate causation. Mason v. Life & Cas. Ins. Co. of Tenn., 41 So. 2d 153, 155 (Fla. 1949). The court in Mason interpreted a life insurance policy that excepted from coverage "death resulting directly from the use of intoxicating liquors," and the court held that the provision "refers to the effect of the use of intoxicating liquors upon the system of an assured as distinguished from acts committed by him by reason of his being under the influence of, or his mind being affected by, intoxicants." Id. The court concluded that alcohol consumption did not directly cause the death of a decedent who was killed when she walked into traffic while intoxicated, id. at 154–55.

Beach Community persuasively argues that it suffered a loss "resulting directly" from its extension of credit in reliance on the forgery "because [Juanita's forged] personal guaranty caused [Beach Community] to enter into a transaction and extend credit where it otherwise would not have," and the guaranty would have had value if it had been authentic. The bond covers losses that "result[]

11

directly" from the extension of credit when a bank relies on a forgery in good faith and has physical possession of the forgery. The measure of the loss Beach Community suffered is based on the amount of credit extended, not the amount that could be recovered in a hypothetical collection effort. See FDIC v. United Pac. Ins. Co., 20 F.3d 1070, 1080 (10th Cir. 1994) ("'[T]he "loss" occurred and was suffered by the plaintiff, without regard to its possible remedies, when its funds in fact were diverted . . . .'") (quoting Fitchburg Sav. Bank v. Mass. Bonding & Ins. Co., 274 Mass. 135, 150, 174 N.E. 324, 328 (1931)). The decline in Charles and Juanita's wealth had nothing to do with the extension of credit to Dellwood and should not affect the coverage of the loss.

Insurance of guaranties would be illusory if a default by the borrower or decline in his wealth severed the direct causal relationship between reliance on a forged guaranty and a loss because a guaranty is enforced only when the borrower defaults and is unable to pay. The Fifth Circuit acknowledged when it interpreted a financial institution bond that "[t]here will always be some intervening cause for the failure of [loans issued by an insured bank] to be repaid; otherwise the bank would suffer no loss." First Nat'l Bank of Louisville v. Lustig, 961 F.2d 1162, 1167 (5th Cir. 1992).

We are persuaded by decisions from our sister circuits that have similarly

12

held that the coverage that financial institution bonds provide for losses that "result[] directly from" fraud or dishonesty by employees is unaffected by events that follow the fraudulent act, such as an economic downturn, bankruptcy, or death of the creditor, that would have limited recovery by the insured. See Ohio Cas., 555 F.3d at 571; Lustig, 961 F.2d at 1167–68. "A loss is directly caused by the dishonest or fraudulent act within the meaning of the Bond where the bank can demonstrate that it would not have made the loan in the absence of the fraud." Lustig, 961 F.2d at 1167. St. Paul argues that Ohio Casualty and Lustig are distinguishable because fraudfeasors intend to cause a loss, but we disagree. The forgery of a guaranty is also intended to cause a bank to disburse funds that it would not otherwise loan. Although St. Paul also contends that in Lustig the Fifth Circuit used the term "proximate causation," Lustig, 961 F.2d at 1169, the court conducted an analysis similar to that in Ohio Casualty, where the Seventh Circuit rejected the use of tort concepts in interpreting financial institution bonds, 555 F.3d at 570–71. See Lustig, 961 F.2d at 1167–68.

St. Paul erroneously relies on decisions from other courts that have held that a bank did not satisfy the requirement of a financial institution bond that a loss "result[] directly from" reliance on a forgery when the forged documents either described non-existent collateral or misrepresented the value of collateral.

13

Flagstar Bank, FSB v. Fed. Ins. Co., No. 05-70950, slip op. at 12 (E.D. Mich. Nov. 17, 2006); KW Bancshares, Inc. v. Syndicates of Underwriters at Lloyd's, 965 F. Supp. 1047, 1054–55 (W.D. Tenn. 1997); French Am. Banking Corp. v. Flota Mercante Grancolombiana, S.A., 752 F. Supp. 83, 90–91 (S.D.N.Y. 1990); Reliance Ins. Co. v. Capital Bancshares, Inc./Capital Bank, 685 F. Supp. 148, 151–52 (N.D. Tex. 1988); Ga. Bank & Trust v. Cincinnati Ins. Co., 245 Ga. App. 687, 689, 538 S.E. 2d 764, 765–66 (2000); see also Liberty Nat'l Bank v. Aetna Life & Cas. Co., 568 F. Supp. 860, 863 (D.N.J. 1983). But see First Nat'l Bank of Manitowoc v. Cincinnati Ins. Co., 485 F.3d 971, 979–80 (7th Cir. 2007) (loss held to result directly from reliance on forged documents that described non-existent collateral); Pine Bluff Nat'l Bank v. St. Paul Mercury Ins. Co., 346 F. Supp. 2d 1020, 1029–33 (E.D. Ark. 2004) (same). In these decisions, banks suffered losses "not because [documents] were . . . forged, but solely because the assets purportedly represented thereby were non-existent." Flagstar Bank, No. 05-70950, slip op. at 10 (quoting Liberty Nat'l Bank, 568 F. Supp. at 863). The rule illustrated in the decisions that St. Paul cites is inapplicable to many situations where a forgery was not the "but for" cause of a loss. Instead, decisions from other courts distinguish situations where "even if [the documents that secured a loan] had borne legitimate signatures, they still would have been worthless" from

14

situations where "if [the documents] had borne legitimate signatures, they would have had value." Union Planters Bank, N.A. v Cont'l Cas. Co., 478 F.3d 759, 765 (6th Cir. 2007). See also Flagstar Bank, No. 05-70950, slip op. at 14 (distinguishing between decisions that involve obligations or collateral "that [are] fictional" and obligations or collateral "that subsequently lose[] value").

Unlike decisions relied upon by St. Paul, an authentic guaranty from Juanita would have had value. St. Paul makes no allegation that Juanita and Charles had misrepresented their wealth to Beach Community before approval of the loan. Juanita had few assets, but a guaranty from Juanita would have had value because it would have imposed a legal obligation on her. Beach Community could have obtained a judgment against Juanita and attached any non-exempt income or assets that Juanita owned or would have acquired over the next twenty years, see Fla. Stat. § 95.11(1). If Juanita were to win the Florida Lottery, for example, Beach Community could attach her winnings.

St. Paul argues that a decision in favor of Beach Community would transform the bond into credit insurance, but we disagree. "[T]his court has long recognized that a [financial institution] bond 'is not a policy of credit insurance and does not protect the bank when it simply makes a bad business deal.'" Republic Nat'l Bank, 894 F.2d at 1263 (quoting Calcasieu-Marine Nat'l Bank v.

15

Am. Emp'rs Ins. Co., 533 F.2d 290, 299 (5th Cir. 1976)). Observance of the direct causation, physical possession, reliance, and good faith requirements prevents the bond from becoming credit insurance. The bond does not contain any language that excludes coverage when a bank would still suffer a loss absent a forgery, and courts have allowed banks to recover losses in these situations when the forged document described legitimate assets or obligations, see Ohio Cas., 555 F.3d at 570–71; Lustig, 961 F.2d at 1167–68.

### B. The Record Does Not Support Entry of Summary Judgment on Any Alternative Ground.

St. Paul presents three alternative grounds to affirm the entry of summary judgment in its favor: Beach Community did not rely on the guaranty, did not have actual physical possession of the guaranty when it extended credit, and did not extend credit in good faith. The problem for St. Paul is that there is contrary evidence about each of these issues, and we must view the evidence in the light most favorable to Beach Community, Atwater v. Nat'l Football League Players Ass'n, 626 F.3d 1170, 1175 (11th Cir. 2010). We address each of these issues in turn.

### 1. St. Paul Is Not Entitled to Summary Judgment Based on a Lack of Reliance by Beach Community.

St. Paul argues that we should affirm the summary judgment in its favor

because Beach Community did not "extend[] credit . . . on the faith of" Juanita's forged guaranty as required by the bond, but we disagree. Although we have held that a bank "must establish that it relied on the forged" document to recover a loss under a financial institution bond, Republic Nat'l Bank, 894 F.2d at 1263, the record contains evidence that Beach Community, in fact, relied on the guaranty. That evidence forecloses a summary judgment in favor of St. Paul on this ground.

St. Paul stresses that the loan committee of Beach Community did not conduct an analysis of Juanita's creditworthiness and approved the loan before it received a signed guaranty, but there is more to this story. Representatives of Beach Community explained that approval of the loan was conditioned on receipt of a guaranty from Juanita, one official testified that the recognition of tenancies by the entirety under Florida law can impair efforts to collect debts from a debtor when the debtor's spouse is not a guarantor of the debt, and Bennett testified that Beach Community did not allow him to disburse any funds to Dellwood until he received the guaranty that was purportedly signed by Juanita. Bennett did not take steps to verify the authenticity of the signature on the guaranty form, but the standard guaranty form that Beach Community used did not require signatures by a witness or a notary.

St. Paul also erroneously argues that Beach Community did not rely on a

guaranty from Juanita because "Beach [Community] requested Mrs. Faircloth's guarantee not to make her an additional source of repayment but to help ensure that Beach [Community] could reach Mr. Faircloth's assets if any were held through a tenancy by the entireties." St. Paul fails to appreciate the property rights that Juanita presumptively held. Property jointly owned by married persons in Florida is presumptively held in a tenancy by the entirety, Beal Bank, SSB v. Almand & Assocs., 780 So. 2d 45, 57–59 (Fla. 2001), and property they held in a tenancy by the entirety "belongs to neither spouse individually, but each spouse is seized of the whole." Id. at 53. Charles and Juanita would have had equal interests in any property they held in a tenancy by the entirety, and "only the creditors of both the husband and wife, jointly, may attach the tenancy by the entireties property." Id. A representative of Beach Community conceded that he did not ask whether Charles and Juanita owned any property as tenants by the entirety, but the representative also explained that he assumed Charles and Juanita owned property as tenants by the entirety based on his knowledge of Florida law and his examination of Charles's financial statements that reflected Charles had partial interests in some properties. The representative was also aware that Charles could hinder collection efforts by transferring assets to Juanita.

St. Paul also erroneously contended at oral argument that the bond should

18

be construed to cover Beach Community's loss to the extent that it relied on the guaranty so that if Beach Community knew that Juanita had $100,000 at the time Beach Community extended credit, the bond would cover losses only up to $100,000. We agree that reliance is a prerequisite to coverage, but we cannot hold that coverage is limited to the value of assets held by Juanita individually at the time the loan was approved. A lender in a state that recognizes tenancies by the entirety may rely on a guaranty from the spouse of the borrower, even if the spouse owns few assets individually, because the guaranty may be necessary to reach assets held in a tenancy by the entirety. We could also imagine other situations where a bank could rely on a guaranty to secure a loan worth more than the net worth of the guarantor.

St. Paul argues that Republic National Bank, 894 F.2d 1255, where we held that a bank could not have relied on a forgery, should control our resolution of this appeal, but that opinion is distinguishable. That decision involved a bank that had honored a letter of credit upon presentation of a forged bill of lading. Id. at 1260–63. The bank had issued the letter of credit based on the creditworthiness of the purchaser of the letter of credit and "irrevocably committed itself to extend credit" before it even obtained the forged bill of lading from the third party who was the beneficiary of the letter of credit. Id. at 1262. Unlike the bank in

19

Republic National Bank, Beach Community did not accept as authentic a forgery presented after the extension of credit to Dellwood. Beach Community instead conditioned the loan on a guaranty from Juanita and did not disburse funds to Dellwood until Beach Community had obtained the guaranty with her forged signature.

St. Paul also relies on United States National Bank in Johnstown v. Reliance Insurance Co., 348 Pa. Super. 30, 501 A.2d 283 (1985), and Continental Bank v. Phoenix Insurance Co., 24 Cal. App. 3d 909, 101 Cal. Rptr. 392 (1972), which upheld findings that a bank had not relied on a forgery, but those decisions involved a different procedural posture. Both United States National Bank and Continental Bank held that evidence submitted at a trial was sufficient to support a factual finding that a lender did not rely on a forged guaranty. Our review of the summary judgment in favor of St. Paul raises a different issue. Our inquiry is not whether sufficient evidence has been presented to support a finding of fact but whether "there is no genuine issue as to any material fact." Jean-Baptiste, 627 F.3d at 820. The evidence is disputed as to whether Beach Community relied on the guaranty.

2. St. Paul Is Not Entitled to Summary Judgment on the Ground That Beach Community Did Not Have Actual Physical Possession of the Guaranty.

St. Paul argues that Beach Community failed to satisfy the "actual physical

20

possession" requirement of the bond, but this argument fails. At a minimum, a factual question exists as to whether Bennett acted as an agent of Beach Community at the closing. The bond required that Beach Community have possession of the guaranty when it extended credit. Although no employee of Beach Community was present at the closing, Beach Community obtained loan participation coverage under the bond, which allowed the requirement of actual physical possession to be satisfied when "a correspondent bank or other representative authorized to possess [documents such as guaranties]" possesses them "on behalf of the [insured bank]."

The parties agree that Bennett would have been an authorized representative of Beach Community under the terms of the bond if Bennett were an agent of Beach Community under Florida law. "'Essential to the existence of an actual agency relationship is (1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent.'" Villazon v. Prudential Health Care Plan, Inc., 843 So. 2d 842, 853 n.10 (Fla. 2003) (quoting Goldschmidt v. Holman, 571 So. 2d 422, 424 n.5 (Fla. 1990)). "[A]cting as a closing agent in a loan transaction does not create an agency or employer-employee relationship between the closing agent and the lending institution," United States v. Musgrave, 444 F.2d 755, 760

21

(5th Cir. 1971), but even a closing attorney selected by and paid by the borrower may primarily owe duties to the lender, <u>Sibley v. Fed. Land Bank of New Orleans</u>, 597 F.2d 459, 462–63 (5th Cir. 1979).

Bennett's testimony at his deposition creates a factual question about his relationship with Beach Community that forecloses a summary judgment for St. Paul on this ground. Bennett explained that as the closing agent he had a duty to "follow closing instructions as presented to [him]." With respect to the guaranties, he had the duty to "have signatures obtained and/or placed on the documents, collect them up, and send them back just like all the other documents they provide me." Bennett explained how he, to use his term, "verif[ied]" for Beach Community before disbursing the funds: "Delivery either by fax, e-mail, call. You know, you don't disburse unless lender says green light. . . . And then upon that authorization, hopefully by then have their funds in the account, and then disburse according to the closing statement." Bennett said he was not responsible for determining the authenticity of signatures, but this fact does not resolve whether he obtained physical possession of the guaranty as a representative of Beach Community.

3.  St. Paul Is Not Entitled to Summary Judgment on the Ground That Beach Community Did Not Act in Good Faith.

22

St. Paul also argues that it is entitled to summary judgment because Beach Community failed to satisfy the requirement of good faith when it made no effort to verify the authenticity of the signature on the guaranty, but St. Paul complains of actions by Beach Community that can be described as nothing more than negligence. We have held that the requirement of good faith in the forgery provision of a financial institution bond does not bar recovery under Florida law when the insured failed to verify the legitimacy of financial statements because "[o]rdinary negligence, without more, does not convert good faith into bad." First Nat'l Bank of Fort Walton Beach v. U.S. Fid. & Guar. Co., 416 F.2d 52, 57 (5th Cir. 1969). The Florida Supreme Court has also acknowledged that issuers of financial institution bonds assume the risk of negligence by the insured bank and that this risk is reflected in the premiums issuers charge to banks. Dixie Nat'l Bank of Dade Cnty. v. Emp'rs Commercial Union Ins. Co. of Am., 463 So. 2d 1147, 1152 (Fla. 1985). We cannot say that the record establishes without dispute a lack of good faith that would support a summary judgment in favor of St. Paul.

## IV. CONCLUSION

We **VACATE** the summary judgment in favor of St. Paul and **REMAND** for further proceedings.